Jimmie Davis WATSON, Appellant,

v.

The STATE of Texas, Appellee.

No. 1052–86.

Court of Criminal Appeals of Texas, En Banc.

Dec. 14, 1988.

Douglas H. Parks, Dallas, for appellant.

Henry Wade, former Dist. Atty., John Vance, Dist. Atty. and Gilbert P. Howard, Mark Nancarrow and Donald Land, Asst. Dist. Attys., Dallas, Robert Huttash, State's Atty., Austin, for the State.

## OPINION ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

ONION, Presiding Judge.

Appellant was convicted by a Dallas County jury of burglary of a habitation. V.T.C.A., Penal Code, § 30.02. Finding the enhancement paragraph in the indictment to be true, the trial court assessed punishment at 25 years' imprisonment.

The Fort Worth Court of Appeals reversed the conviction based on an error in the jury charge. *Watson v. State,* 660 S.W.2d 882 (Tex.App.—Ft. Worth 1983). This Court reversed the judgment of the Court of Appeals citing *Almanza v. State,* 686 S.W.2d 157 (Tex.Cr.App.1985), and finding that no harm accrued to appellant as a result of the jury charge submitted by the trial court. *Watson v. State,* 693 S.W.2d 938, 940 (Tex.Cr.App.1985). The cause was remanded to the Court of Appeals for consideration of appellant's remaining grounds of error.

On this second go around the Court of Appeals affirmed the conviction, holding *inter alia* that appellant's silence after being advised of his rights and being asked to make a statement was not sufficient under the circumstances to indicate that he wished to remain silent and to cut off questioning. *Watson v. State,* 715 S.W.2d 864, 868–874 (Tex.App.—Ft. Worth 1986).

The sole ground of review set forth in appellant's petition for discretionary review urges that the "Court of Appeals improperly held that an arrestee has an affirmative obligation to explicitly state his objection to further questioning by police where [he]

has been given and understood the *Miranda* warnings and where there is no evidence of coercion or undue pressure depriving the accused [of] control of the interrogation."

We granted said petition to determine the correctness of the ruling by the Court of Appeals.

The record reflects that appellant and one Larry Jordan were caught in the act of attempting to burglarize a habitation at 1517 King Arthur [1] in Grand Prairie in the evening of December 26, 1981. On December 28, 1981, appellant, while in jail, was interrogated on four separate occasions by Officer Myer and Detective Shaw concerning an earlier burglary that had occurred on December 20, 1981, at the Perkins' residence at 1509 Austrian in Grand Prairie in the same neighborhood as the location of the said attempted burglary. At the last interrogation appellant made certain oral statements that led to some of the items that were taken in the Perkins burglary. See Article 38.22, § 3(c), V.A.C.C.P.

Appellant filed a pretrial motion requesting that before any evidence of a confession, oral or written, be introduced a hearing on the voluntariness of any admission or confession be conducted in the jury's absence, contending that if there were conversations with the officers they occurred while appellant was in custody. See *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); Article 38.22, V.A.C. C.P.

At trial the *Jackson v. Denno* hearing was conducted outside the presence of the jury to determine the voluntariness of appellant's statements made during custodial interrogation. At such hearing Grand Prairie Police Officer Dennis Myer was called by the State and was the only witness to testify.[2]

Myer testified that he and Detective Shaw first interviewed appellant about the Perkins burglary between 9 and 9:30 a.m. on December 28, 1981. Myer first read to appellant his *Miranda* warnings [3] and stat-

---

1. The arresting officer testified the address was "1517 King Arthur." The Court of Appeals' opinion refers to "1517 Kingsbridge."

2. It was shown that Detective Shaw was on vacation at the time of trial and did not testify. Appellant offered no evidence.

3. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Officer Myer testified that he read the rights to appellant from a "*Miranda* card" as follows:

 "You have the right to remain silent; anything you say can and will be used against you in a court of law; you have the right to talk to a lawyer and have him present with you while you're being questioned; if you can't afford to hire a lawyer one will be appointed to represent you before any questioning if you wish.

 "*You can decide at any time to exercise these rights and not answer any questions and make any statements.*" (Emphasis supplied.)

 When asked before the jury what warning appellant was given (at what the *Jackson v. Denno* hearing showed to be the third interrogation), Officer Myer repeated the same warnings quoted above. The first two interrogation were not revealed to the jury at the trial on the merits.

 The *Miranda* warnings must inform the person in custody "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either re-

tained or appointed." *Miranda*, supra, 86 S.Ct. at 1612. See also *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 324, n. 6, 46 L.Ed.2d 313 (1975). Although the right to terminate the interview at any time is not expressly among those warnings required by *Miranda*, *Perillo v. State*, 758 S.W. 2d 567, 575 (Tex.Cr.App.1988), *Miranda* stressed that "[w]ithout the right to cut off questioning, the setting of the in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been invoked." *Miranda*, supra, 86 S.Ct. at 1628.

The warnings given by Officer Myer to appellant about deciding at any time to exercise his right and not answer questions or make statements is commonly a part and parcel of the *Miranda* cards used by law enforcement officers in giving the required warnings.

It is observed that Article 15.17, V.A.C.C.P., relating to the warnings to be given by the magistrate include "... of his right to terminate the interview at any time...." Article 38.22, § 2(a)(5), relating to the taking of written confessions or statements uses the same terminology. The statements in the instant case were, however, oral and if admissible, were admissible under Article 38.22, § 3(c), V.A.C.C.P. (leading to the fruits of the crime), and it has been held that the *Miranda* warnings must precede such oral statements. See *Perillo*, supra, at 575; *Butler v. State*, 493 S.W.2d 190, 193, n. 1 (Tex. Cr.App.1973); *Moore v. State*, 505 S.W.2d 887 (Tex.Cr.App.1974).

ed that appellant acknowledged to him that he understood those rights. The record then reflects:

"Q. And after he acknowledged those did he indicate to you that he wished to speak with you?

"A. Yes, sir.

"Q. Did he at any time ask for an attorney?

"A. Not at that time."

On cross-examination Officer Myer testified as to the first interrogation:

"Q. [Defense Counsel] You say you read Mr. Watson his rights?

"A. Yes, sir.

"Q. And he refused to talk?

"A. Yes.

"Q. Who was doing the talking during that thirty or forty-five minutes?

"A. We were [Officer Myer and Detective Shaw].

"Q. What were you saying?

"A. Just asking questions.

"Q. *He wasn't answering?*

"A. *No, Sir.*

"Q. And you did that for thirty or forty-five minutes?

"A. Yes, sir.

"Q. *Did he ever answer any of your questions?*

"A. *No, sir.*

 * * * * * *

"Q. At any time during that thirty or forty-five minute interrogation did Mr. Watson indicate to you that he didn't wish to talk to you anymore?

"A. No, sir.

"A. Just sat silent?

"A. Yes, sir." (Emphasis supplied.)

Appellant was returned to his jail cell about 10:30 a.m.

The record reflects that thereafter in response to the prosecutor's questions about appellant being "arraigned"[4] Officer Myer agreed that appellant was "arraigned" about 11 a.m. No further details of that action were elicited and it is unclear whether appellant was "arraigned" on the Perkins burglary or on some other offense. Myer then testified the second interrogation of appellant began about 1 p.m., the same being initiated by the officers. Again appellant was given his *Miranda* warnings and acknowledged he understood his rights. Appellant did not at any time acknowledge that he wanted to talk to the officers and after 20 minutes he was "placed—back in a cell." The record reflects on direct examination:

"Q. [Assistant district attorney] He didn't want to talk to you then?

"A. No, sir."

On cross-examination the record reflects:

"Q. Had Mr. Watson indicated to you from his cell he changed his mind and wanted to talk to you?

"A. No, sir.

"Q. Did he talk to you on that occasion?

"A. No, sir."

The third interrogation initiated by the officers took place about 3 p.m. Appellant was again given the *Miranda* warnings and indicated that he understood his rights.

**4.** It is observed that the word "arraigned" was first used by the prosecutor in framing his questions to Officer Myer. The trial judge used it in his findings of facts and the Court of Appeals used it in their opinion. *Watson v. State*, 715 S.W.2d 864 (Tex.App.–Ft. Worth 1986). Apparently the term was used to indicate that the appellant was taken before a magistrate in accordance with Article 15.17, V.A.C.C.P. While the procedure described in Article 15.17, supra, might be called "arraignment" in other jurisdictions or by the news media, it is not arraignment in Texas. Chapter 26 of the Texas Code of Criminal Procedure provides for arraignment in all felony cases, *after indictment* and all misdemeanor cases punishable by imprisonment. See Article 26.01, V.A.C.C.P. And arraignment takes place for the purpose of fixing a defendant's identity and hearing his plea. See Article 26.02, V.A.C.C.P. The time of arraignment and other procedures are set forth in the various articles contained in the said Chapter 26. See *Bustillos v. State*, 490 S.W.2d 563 (Tex.Cr.App. 1973); *Boening v. State*, 422 S.W.2d 469, 473 (Tex.Cr.App.1968). Thus the said statutory arraignment in Texas is to be distinguished from the procedure prescribed by Article 15.17, supra, and the use of the term "arraignment" for this latter procedure is misleading. Whether correct or not, the terms "magistratized" or "magistrated" have come into common vogue in the Texas legal world to describe the Article 15.17, supra, procedure.

For "fifteen or twenty minutes" appellant made no response to any of the questions asked him, then the appellant told the officers that the man with whom he was arrested, Larry Jordan, had a watch with him at the time of arrest that was taken in the Perkins burglary. On cross-examination the record reflects:

"Q. Had Mr. Watson said any word or given any indication to you that after having refused to talk on two prior occasions he changed his mind and wanted to talk on the third occasion?

"A. *He did when he answered the questions.*

"Q. When you brought him out of his cell and took him down he sent word he wanted to talk?

"A. No, sir."

After eliciting the information about Larry Jordan the appellant was returned to his cell. The officers found the watch in Jordan's property and determined it had been taken from the Perkins residence. Myer then confronted Jordan with appellant's statement. Thereafter Jordan orally confessed implicating appellant in the burglary. He later signed a written confession.

Thereafter, and for the fourth time that day, the officers interrogated appellant at their own instance. He was again given the *Miranda* warnings and acknowledged again he understood his rights. The officers confronted appellant with information received from Larry Jordan. Appellant explained that he, Larry and his brother, Michael Jordan, planned to "hit the house together" but when he and Larry arrived at the Perkins' residence they saw Michael's car departing, that Larry Jordan entered the house and took a microwave, stereo, watch and other items. Appellant stated he remained in the car and denied he acted as a lookout. He admitted that he and Larry Jordan took all the stolen items to Michael Jordan's house except a stereo that they sold to a Mr. Mowry on Bernal Street. That same evening appellant accompanied Officer Myer and pointed out Michael Jordan's house on Canada Street. Michael Jordan was arrested there the next day, and after he gave consent to search the police recovered several video cassettes taken from the Perkins' residence. The microwave was recovered from a neighbor's house, and appellant pointed out Mowry as the man to whom the stereo was sold, and the missing stereo was eventually recovered from Mowry.

There was no evidence offered at the hearing as to appellant's age, competency, background, education or experience, etc. While Officer Myer testified that no promises were made to appellant, the State, with the burden of proof, offered no other evidence as to the lack of coercion or undue pressure in the jail setting than that already described.

The court found at the conclusion of the *Jackson v. Denno* hearing that the oral statements had been given freely and voluntarily and were admissible in evidence. No issue of voluntariness was raised by the evidence before the jury.

The trial court filed its written findings of facts and conclusions of law after the Court of Appeals abated the appeal and ordered the same done. See Article 38.22, V.A.C.C.P.; *McKittrick v. State*, 535 S.W. 2d 873 (Tex.Cr.App.1976).

In its written findings the court found that appellant had been duly warned of his rights, had acknowledged he understood his rights, and "indicated he wished to speak to Officer Myer" and did not ask for an attorney, "and further did not admit anything as to being involved in the burglary ..." and the officers quit talking to the appellant and left. The court found on three other occasions he was warned of his rights, acknowledged he understood the same, and did not ask for an attorney, that on the third of the four occasions he implicated Larry Jordan, and that on the last occasion admitted his involvement in the burglary and showed the police where he and Larry Jordan had taken the stolen property.

The trial court further found that appellant knowingly, intelligently and voluntarily waived the rights of which he was informed and made the oral admissions and

statements without compulsion or persuasion.

*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, (1966), delineated specific procedures to safeguard the Fifth Amendment privilege against self-incrimination during custodial interrogation. *Miranda* held that unless law enforcement officers give certain specified warnings prior to questioning a person in custody and follow certain specified procedures during the course of any subsequent interrogation the prosecution may not use in its case-in-chief any statement by the defendant over his objection. 384 U.S. at 476–79, 86 S.Ct. at 1629–30; accord *Oregon v. Elstad*, 470 U.S. 298, 317, 105 S.Ct. 1285, 1298, 84 L.Ed. 2d 222 (1985); *Michigan v. Mosley*, 423 U.S. 96, 99–100, 96 S.Ct. 321, 324–25, 46 L.Ed.2d 313 (1975).

"We have concluded that without proper safeguard the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda*, 384 U.S. at 467, 86 S.Ct. at 1624.

The "right to cut off questioning" is among the procedural safeguards established by *Miranda*, 384 U.S. at 474, 86 S.Ct. at 1628. This particular right, established as a "critical safeguard" of the Fifth Amendment right to remain silent, *Mosley*,

423 U.S. at 103, 96 S.Ct. 326, requires the police to immediately cease interrogating a suspect once the suspect "indicates in any manner, at any time ... during questioning, that he wishes to remain silent." *Miranda*, 384 U.S. at 473–74, 86 S.Ct. at 1627–28; *Mosley*, 423 U.S. at 100, 96 S.Ct. at 325.

Although established in *Miranda*, it was in *Mosley* that the Court delineated the scope of "the right to cut off questioning." Reiterating that this right serves as an essential check on "the coercive pressures of the custodial setting" by enabling the defendant to "control the time at which questioning occurs, the subject discussed, and the duration of the interrogation," 423 U.S. at 103–04, 96 S.Ct. at 326, *Mosley* reaffirmed *Miranda's* requirement that "the interrogation must cease" when the person in custody "indicates in any manner" that he wishes to remain silent. 423 U.S. at 101–02, 96 S.Ct. at 325–26.[5] This requirement is found incorporated in *Mosley's* holding that statements taken after a defendant indicates his desire to remain silent are inadmissible unless the defendant's "right to cut off questioning was scrupulously honored." See 423 U.S. at 101, 103–04, 96 S.Ct. at 325–26.

Yet *Mosley*, 423 U.S. at 102–03, 96 S.Ct. at 326–27, denied that *Miranda* created "a per se proscription of indefinite duration" against further questioning after a defendant's assertion of the right to silence. *Mosley* found that *Miranda* did not require that all interrogation cease indefinitely, merely that the police must "scrupulously honor" the defendant's right to remain silent by (1) immediate cessation of question-

---

5. In *Miranda* itself the Court wrote:

"Once warnings have been given, the subsequent procedure is clear. If the individual *indicates in any manner, at anytime prior to or during questioning* that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a

statement after the privilege has been once invoked." 384 U.S. at 473–74, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723. (Emphasis supplied.)

While *Mosley* rejected the literal interpretation of this passage in *Miranda* because it would lead to "absurd and unintended results," 423 U.S. at 102, 96 S.Ct. at 325, the Court did say that "[t]o permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned." *Id.*

ing; (2) resumption of questioning only after the passage of a significant period of time, (3) provision of a fresh set of *Miranda* warnings, and (4) restrictions of the second interrogation to a crime that was not a subject of the earlier interrogation. 423 U.S. at 104–06, 96 S.Ct. at 326–28.

The facts in *Mosley* must be kept in mind. The defendant in custody was approached by a detective from the Armed Robbery Section of the Detroit Police Department, given his *Miranda* rights after which the detective began to question Mosley about two recent robberies. Mosley declined to answer any questions about the robberies and the interrogation ceased. Several hours later another detective from the Homicide Bureau gave Mosley his *"Miranda"* rights and began to interrogate him about a murder apparently unrelated to the two aforesaid robberies. Mosley first denied any involvement in the murder but when told he had been named in a confession as the "shooter" he made a statement implicating himself in the fatal shooting. He was never interrogated about the two robberies. It was Mosley's contention that his assertion of his right to silence as to the two robberies prohibited the use of any confession to the murder made at the second interrogation which was restricted to another offense. The *Mosley* Court concluded that *Miranda* did not preclude the use of the inculpatory statement as to the murder made at the second interrogation. In *Mosley,* as in the instant case, there was no claim that the defendant had asserted his right to counsel. It is clear that a defendant may assert one of his constitutional or *Miranda* rights and not another.

The important question herein is whether the appellant invoked his constitutional right to remain silent.

 We agree with the Court of Appeals that one of the difficulties with the instant case is that, as shown by the one-witness *Jackson v. Denno* hearing, the appellant did not at any time make any explicit oral or written remark or statement that he wished to remain silent or that he wanted to cut off the questioning. There is no talismanic word or phrase with which to invoke the right to remain silent. In fact, words may not be necessary at all because *Miranda* makes clear that the interrogation must cease when the person in custody "indicates in any manner" that he wishes to remain silent. 423 U.S. at 101–02, 96 S.Ct. at 325–26. This is far broader than a requirement that there be some verbal expression or explicit objection, although the Supreme Court has not listed the ways that a defendant may indicate "in any manner" his desire to remain silent or to cut off questioning. It is true that silence by an arrestee or a defendant following the receipt of *Miranda* warnings can be "insolubly ambiguous" in some contexts, *Doyle v. Ohio,* 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.E.2d 91, 97 (1976); *United States v. Hale,* 422 U.S. 171, 176–77, 95 S.Ct. 2133, 2136–37, 45 L.Ed.2d 99, 104–105 (1975),[6] and we are aware of the out-of-state cases cited by the Court of Appeals for the proposition that *"Miranda* should not be read so strictly as to require the police to accept as conclusive any statement or act, no matter how ambiguous, as a sign that the suspect desires to cut off questioning."[7]

Each case must, however, be decided on the totality of the circumstances in that particular case.

If, at the first interrogation after receiving the *Miranda* warnings and acknowledging he understood his rights, the appellant gave some sort of "indication" he would speak to the officers, it appears he gave, almost immediately, a contrary "indication." For 30 or 45 minutes he did not answer any questions about the Perkins burglary. Officer Myer agreed in his testimony that appellant "refused to talk." It is not clear whether Myer meant that appellant explicitly refused to talk or whether

6. The issue presented in *Doyle* and *Hale* was whether a defendant's post-arrest silence could be used by impeaching him as a witness in his own behalf.

7. *State v. Woods,* 374 N.W.2d 92, 99 (S.D.1985), and other cases cited in *Watson,* 715 S.W.2d at 873.

he was characterizing appellant's silence or refusal to respond to any questions during the time period. Certainly under the circumstances appellant was not cooperating with the police and had demonstrated to them that he wished to remain silent in accordance with the particular and express *"Miranda"* warnings given by Officer Myer that he could "exercise these rights" by not answering questions. The appellant was returned to his cell. Clearly at this time the officers were under no impression that appellant wanted to speak to them. They were not misled. There is nothing to show the officer considered his action ambiguous nor any showing that they asked any questions seeking to clarify his intentions. They were put on notice their questioning should cease. To fault the appellant for not explicitly stating his objection to further interrogation would be illogical when he responded in the manner he was warned he could employ in exercising his right to silence, see footnote No. 3, and the record shows the officers had gotten the message and understood it.

At the second interrogation initiated by the police appellant still did not answer questions. After 20 minutes of interrogation he was returned to his cell with Myer again explaining to the prosecutor appellant "didn't want to talk." Appellant demonstrated again he was exercising his right to silence. Nevertheless, the police initiated a third interrogation on the same offense and the same pattern continued for 15 to 20 minutes. As earlier noted, the record reflects on cross-examination Officer Myer at the *Jackson v. Denno* hearing:

> "Q. Had Mr. Watson said any word or given any indication to you that after having refused to talk on two occasions he changed his mind and wanted to talk on the third occasion?
>
> "A. He did when he answered the questions."

It appears that the appellant finally mentioned a watch being in Larry Jordan's possession. He did not implicate himself. After Larry Jordan orally confessed implicating appellant the officers initiated a fourth interrogation in which appellant was confronted with Jordan's oral statement. The oral statements complained of were then elicited from the appellant. Here the police knew appellant had "refused to talk" and "didn't want to talk" yet the police persisted in repeated efforts to wear down his resistance and make him change his mind.[8]

■ There need not be a formal invocation of constitutional or *Miranda* rights. Anything said or done by the defendant that could reasonably be interpreted as a desire to invoke these rights should be sufficient to halt questioning. *Faulder v. State*, 611 S.W.2d 630, 640 (Tex.Cr.App. 1979) (Opinion on rehearing). In *People v. Pack*, 248 Cal.Rptr. 240, 201 Cal.App.3d 679 (Cal.App.2d Dist.1988), it was pointed out that a defendant need not make express statements to invoke his Fifth Amendment privileges, and no particular forms of words or conduct are necessary.

> "Courts hold many fact patterns and different types of conduct effective to assert *Miranda* rights, *whether express or implied.* A suspect may assert that he desires counsel or does not wish to talk; explicit statements like these effectively invoke the suspect's rights and should result in a cessation of questioning. From that moment forward the rules for determining the validity of a subsequent waiver of rights must be followed in order for reinterrogation to take place. For example, *a general refusal to cooperate is tant-amount to an assertion of the right to silence, and a continuation of questioning under those circumstances is invalid.*[74]

8. In *United States v. Hernandez*, 574 F.2d 1362 (5th Cir.1978), the Court held that "the number of times a person is advised of his rights prior to making statements is not immaterial to the question of voluntariness or admissibility of statements; more times the police inform a suspect of his rights in the face of his repeated invocation of one of those rights, right to remain silent, clearer it becomes that the police must not mean what they say, and this is the type of subtle coercive pressure which the *Miranda* opinion condemned."

"74 See *U.S. v. Hernandez,* 574 F.2d 1362 (5th Cir.1978)." Ringel, Searches and Seizures, Arrests and Confessions (5/88), Vol. 2, § 28.4(a), p. 28–46. (Emphasis supplied.)

■ In the instant case the Court of Appeals erred in holding that the appellant, under the circumstances, had the affirmative obligation to explicitly state his objection to further questioning in order to indicate "in any manner" his wish to remain silent. We conclude that his silence, his refusal to answer any questions during the first and second interrogations and part of the third interrogation, his conduct demonstrating he didn't want to talk and did not want to cooperate with the police was sufficient to indicate his desire to remain silent and to exercise his right to "cut off questioning" particularly given the *Miranda* card warnings that were read to him. The record shows that the police understood appellant "didn't want to talk." There was no reasonable basis for inferring that appellant had changed his mind. While an express assertion or invocation of a right is highly desirable, we reject any requirement that under the circumstances presented the appellant had "an affirmative obligation to explicitly state his objection to further questioning" in order to meet the "indicate in any manner" language of *Miranda,* as the Court of Appeals would seem to have it. *Watson,* 715 S.W.2d at 873. To the extent that *Sawyers v. State,* 724 S.W.2d 24 (Tex.Cr.App.1986), is in conflict herewith, it is overruled.

■ Having found the appellant invoked his right to silence, we must now determine if that right was "scrupulously honored." *Mosley,* 423 U.S. at 101, 103–04, 96 S.Ct. at 325–26. The determination of whether an accused's right to cut off questioning was scrupulously honored requires a case-by-case analysis. *United States v. Hernandez,* 574 F.2d 1362, 1369 (5th Cir.1978); *Christopher v. Florida,* 824 F.2d 836, 840 (11th Cir.1987).

9. The facts in *Roberson* are clearly similar to that of *Mosley.* However, Justice Stevens, writing for the Court, stated:

"However, as *Mosley* made clear, a suspect's decision to cut off questioning, unlike his

Although the assertion of either the right to counsel or the right to silence mandates the cessation of an interrogation the particular right invoked has different impact on the permissibility of subsequent police conduct. *United States ex rel. Riley v. Franzen,* 653 F.2d 1153, 1158 (7th Cir. 1981).

"Police interrogation is more severely restricted after the suspect asserts his right to counsel than after he asserts his right to silence. See *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Michigan v. Mosley,* 423 U.S. at 104 and n. 10, 96 S.Ct. at 326 and n. 10. But see Kamisar, supra [The *Edwards* and *Bradshaw* Cases: The Court Giveth and the Court Taketh Away, in 5 the Supreme Court: Trends and Developments 1982–1983, at 153 (1984)] at p. 157 (arguing that the level of procedural protection should not depend on which right the suspect invokes, since the same police actions are just as coercive after the suspect invokes one right as after he invokes the other and the suspect typically does not know that the extent of his protection hinges on his choice of rights)." *Anderson v. Smith,* 751 F.2d 96, 101 (2nd Cir.1984).

And more recently see *Arizona v. Roberson,* —— U.S. ——, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). The Court there held that the *Edwards* [*v. Arizona,* 451 U.S. 477, 484–485, 101 S.Ct. 1880, 1884–1885, 68 L.Ed.2d 378] rule that a suspect who has invoked his right to counsel is not subject to further interrogation until counsel has been made available to him unless the suspect himself initiates further communication applies even when a subsequent police initiated interrogation occurs in the context of a separate investigation, about a different offense, and the fact that the officer who conducted the suspect's second interrogation did not know that the suspect had earlier requested counsel could not justify the failure to honor the request.[9] Thus, a

request for counsel, does not raise the presumption that he is unable to proceed with a lawyer's advice."

request for counsel acts as an absolute prohibition on the right of the police to initiate questioning until an attorney is appointed or obtained or until the accused initiates the subsequent communication with the authorities. *Arizona v. Roberson*, supra. No such per se proscription upon the right of the police to resume questioning exists where an accused asserts his right to remain silent. Instead, the law enforcement officials are required to cease questioning the accused but may resume the interrogation at some later time under the factors of *Mosley*.

As noted in *Mosley*, the Supreme Court found that the suspect's right to cut off questioning was "scrupulously honored" because "the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation." 423 U.S. at 106, 96 S.Ct. at 327.[10]

"Some courts have viewed the latter fact an essential one to a finding that defendant's rights were 'scrupulously honored' and there is much to be said for this position. As one commentator put it, the fact the crime was 'different in nature and in time and place of occurrence from the robberies for which Mosley had been interrogated' is 'critical,' for without it 'one is left only with a renewed effort to question by a different member of the same police force, in a different room in the same building, only two hours after Mosley's assertion of his right not to be questioned.' " *LaFave and Israel*, Criminal Procedure, Vol. 1, § 6.9, p. 536–537, quoting Stone, The Miranda Doctrine in the Burger Court, 1977 Supp.Ct.Rev. 99, 134.

"Other courts have not deemed a change in the subject matter to be essential. Perhaps that is unobjectionable when it is the defendant who initiated the subsequent conversation, but in other circumstances it is a highly questionable position." Id.

▪ In the instant case the interrogation did not cease immediately after appellant Watson made clear that he wished to remain silent and even continued into a third and a fourth interview. The four interrogations all occurred on the same day separated only by several hours or less. Moreover, the same police officers continued to interrogate appellant on the same crime throughout though the appellant had invoked his right to silence.

From the totality of the circumstances we conclude that the appellant's right to cut off questioning was not "scrupulously honored." Therefore, the oral statements taken during the unlawfully continued interrogation were inadmissible. *Martin v. Wainwright*, 770 F.2d 918 (11th Cir.1985); *Anderson v. Smith*, 751 F.2d 96 (2nd Cir. 1984); *Christopher v. Florida*, 824 F.2d 836 (11th Cir.1987). See also *United States v. Wallace*, 848 F.2d 1464 (9th Cir. 1988).

▪ Moreover, we conclude that the State failed its heavy burden of proving that the appellant had intelligently, understandingly and voluntarily waived his privilege against self-incrimination.[11]

The standard to be applied in determining the question of waiver under federal constitutional law is that the prosecution must prove an intentional relinquishment or abandonment of a known right or privilege. See *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1020, 82 L.Ed. 1461 (1938); *Barbour v. State*, 551 S.W.2d 371, 373 (Tex.Cr.App.1977); *Goodman v. State*, 591 S.W.2d 498, 499 (Tex.Cr.App.1979). And a waiver will not be presumed from a

---

10. And some courts have added a fifth factor from the facts from *Mosley* that a different officer conduct the re-interrogation. See *State v. Turner*, 136 Wis.2d 333, 401 N.W.2d 827, 833 (1987).

11. In Stone, The Miranda Doctrine in the Burger Court, 1977 Supreme Court Review 99, at 133, it is written: "[T]he Court made clear that the requirement that the police 'scrupulously honor' the suspect's assertion of his right to remain silent is independent of the requirement that any waiver be knowing, intelligent, and voluntary."

silent record. *Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962); *Ex parte Auten,* 458 S.W.2d 466 (Tex.Cr.App.1970). And a waiver will not be "lightly inferred" and courts will indulge every reasonable presumption against the waiver. *Johnson v. Zerbst,* supra; see also *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314, 317 (1966); *Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed. 2d 424, 440 (1977); *Webb v. State,* 533 S.W.2d 780, 785 (Tex.Cr.App.1976) (footnotes 7 and 8); *Barbour,* supra, at 373; *Goodman,* supra, at 499. Thus, a "heavy burden" rests on the prosecution to prove that a defendant waived his privilege against self-incrimination. *Miranda,* supra, 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724; *United States v. Guzman–Guzman,* 488 F.2d 965 (5th Cir.1974). See also *Ex parte Bird,* 457 S.W.2d 559 (Tex. Cr.App.1970); *Goodman,* supra, at 499.

Although desirable, the general rule is that neither a written nor an oral express waiver is required. *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *United States v. James,* 528 F.2d 999, 1019 (5th Cir.1976), cert. den. sub. nom., *Austin v. United States,* 429 U.S. 959, 97 S.Ct. 383, 50 L.Ed. 2d 326; *United States v. Hernandez,* 574 F.2d 1362, 1371 (5th Cir.1978).

In *Butler,* 99 S.Ct. at 1757, the Court stated:

"An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendants in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. As was unequivocally said in *Miranda* mere silence is not enough. That does not mean that the defendant's silence coupled with an understanding of his rights and a course of conduct indicating waiver may never

support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."

Implied waivers, however, are clearly disfavored. *Estelle v. Williams,* 425 U.S. 501, 515, 96 S.Ct. 1691, 1698, 48 L.Ed.2d 126, 137 (1975) (Powell, J., concurring); *Barker v. Wingo,* 407 U.S. 514, 525–526, 92 S.Ct. 2182, 2189–2190, 33 L.Ed.2d 101, 114 (1972); *Johnson v. Zerbst,* supra, 304 U.S. at 464, 58 S.Ct. at 1023; *United States v. Hernandez,* supra, at 1371.

In *Butler,* supra, 99 S.Ct. at 1758, the Court stated that "... the question of waiver must be determined on the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461."

In the instant case there was no express written or oral waiver of rights by the appellant nor does the record show any *specific* inquiry as to whether appellant desired to "waive" his rights.

Whether appellant made a valid waiver of his right to silence must be considered in light of the fact that the police officers initiated each of the four interrogations including the last one at which the incriminating oral statements were elicited. Officer Myer testified that at the first interrogation he read the *Miranda* rights to appellant and that appellant "acknowledged" he understood those rights. Then Myer merely gave a "Yes, sir" response to the prosecutor's framed conclusory question as to whether appellant "did indicate" he wished to speak to Myer. This is the strongest indication of waiver of the right to silence.[12] What occurred immediately thereafter according to Myer did not comport with any desire to speak on appellant's part. Appellant remained silent for 30 or

---

**12.** No further questions were propounded along this line. The manner of the "indication" is vague and ambiguous. The record does not

reflect whether the "indication" was verbalized, or whether there was a nod, a sign or something else was utilized.

45 minutes and did not answer any questions. On cross-examination Myer appeared to contradict his earlier testimony when he related that after appellant was given his Miranda warnings the appellant had "refused to talk." Under any circumstances, the testimony was not very clarifying.

The appellant was returned to his cell at the end of the first attempted interrogation. He was "arraigned" although the record does not show what procedure was utilized or whether the "arraignment" was in connection with the Perkins burglary. At the second interrogation appellant remained silent for 20 minutes after being given the warnings and "acknowledging" he understood. Myer acknowledged appellant did not want to talk to the officers. At the third interrogation after warnings and acknowledgement appellant again remained silent for 20 minutes until Myer testified appellant changed his mind and "began answering questions." The fourth interrogation after warnings and acknowledgement has already been described.

The Supreme Court in *Miranda* warned that "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact eventually obtained." 384 U.S. at 475, 86 S.Ct. at 1628.

As noted earlier, appellant's age, background, competency, education, experience, etc., was not developed at the *Jackson v. Denno* hearing, so any evidence of these matters must be gleaned from other parts of the record.[13]

As *Butler*, supra, 441 U.S. at 373–375, 99 S.Ct. at 1757–1758, made clear, courts must presume a defendant did not waive his rights and the prosecution's burden is great but waiver can be inferred form words and actions of the person interrogated including background, experience and conduct.

■ In Texas the courts have also said that waiver is to be determined from the totality of the circumstances. See *Moreno v. State*, 511 S.W.2d 273, 276–277 (Tex.Cr.App.1974), cert. den. 419 U.S. 1115, 95 S.Ct. 794, 42 L.Ed.2d 813 (1975); *Thomas v. State*, 458 S.W.2d 817, 819 (Tex.Cr.App. 1970); *Phifer v. State*, 651 S.W.2d 774 (Tex.Cr.App.1983); *Wilkerson v. State*, 657 S.W.2d 784 (Tex.Cr.App.1983); cert. den. 470 U.S. 1008, 105 S.Ct. 1371, 84 L.Ed.2d 390; *Hawkins v. State*, 660 S.W.2d 65 (Tex. Cr.App.1983); *Ingham v. State*, 679 S.W.2d 503 (Tex.Cr.App.1984). See also *Harville v. State*, 591 S.W.2d 864 (Tex.Cr.App.1979); *Mays v. State*, 726 S.W.2d 937 (Tex.Cr.App. 1986). However, a waiver should not be inferred by an accused's inaction or acquiescence to continued interrogation, or by his failure to utilize his opportunity to call an attorney. *United States v. Ledezma–Hernandez*, 729 F.2d 310 (5th Cir.1984).

We cannot conclude from the totality of the circumstances that appellant voluntarily, knowingly and intelligently waived all of his rights. We are compelled to find that the trial court abused its discretion in finding a valid waiver. See *Ex parte Haliburton*, 755 S.W.2d 131, 135 (Tex.Cr.App. 1988); *Burdine v. State*, 719 S.W.2d 309, 318 (Tex.Cr.App.1986).

Appellant's confession was the anchor of the State's case against him. The complaining witness and his family were not home at the time of the burglary. The investigating officer had no suspects that made out the State's case. The admission of the oral statements was not harmless error under *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), and its progeny or Rule 81(b)(2), Texas Rules of Appellate Procedure.

The judgments of the Court of Appeals and the trial court are reversed and the cause is remanded to the trial court.

CLINTON, Judge, concurring.

In addressing the single ground for review in this cause, see opinion of the Court at 592–93, we will see that adhering to judicial

---

13. After the oral statements were admitted and at the penalty stage of the trial pen packets were introduced. This evidence reflected appellant had entered guilty pleas to three felonies. As the Court of Appeals observed, the instant sentence was made cumulative with a 1982 sentence for murder imposed after the 1981 oral statements here involved.

gloss sometimes may unwittingly undermine a precious constitutional principle and pervert a doctrine designed to safeguard it. See *Michigan v. Tucker,* 417 U.S. 433, 443–444, 94 S.Ct. 2357, 2363–2364, 41 L.Ed.2d 182 (1974).

The Fifth Amendment privilege "serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v. State of Arizona,* 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966)

"[W]ithout proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and *to compel him to speak where he would not otherwise do so freely." Ibid.*[1]

"In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Ibid.*

Accordingly, the Supreme Court formulated the *"Miranda* warnings." When a person in custody is to be subjected to interrogation, the threshold requirement is that "he must first be informed in clear and unequivocal terms that he has *the right to remain silent." Id.,* 384 U.S. at 467–468, 86 S.Ct., at 1624.

Now, twentytwo years later, we are told by the court below that the right to *"re-*

*main silent"* means just a right to *"cut off questioning."*[2]

In *Michigan v. Mosley,* supra, in the early afternoon of April 8, 1971, Detective James Cowie of the Armed Robbery Section of the Detroit Police Department, acting on a tip, arrested Mosley in connection with robberies that had recently occurred at the Blue Goose Bar and the White Tower Restaurant. Detective Cowie brought Mosley to his bureau on the fourth floor of departmental headquarters building. He advised Mosley of his *Miranda* rights and, after filling out necessary arrest papers, Cowie began to question Mosley about the robbery at the White Tower Restaurant. When Mosley "declined to answer any questions" about the robberies, Cowie promptly ceased the interrogation. That bit of business took approximately twenty minutes, during which Mosley never indicated a desire to consult with a lawyer. Mosley was then taken to a cell block on the ninth floor. 423 U.S., at 97, 96 S.Ct., at 323.

Shortly after 6 p.m., Detective Hill brought Mosley from his cell block to the Homicide Bureau on the fifth floor for questioning about the fatal shooting of one Leroy Williams on January 9, 1971, during an attempted holdup outside the 101 Ranch Bar, also in Detroit. Mosley had not been arrested on that charge or interrogated about it by Cowie. Detective Hill advised Mosley of his *"Miranda* rights;" Mosley read the notification form, Hill read and explained the warnings to him and had him sign the form. At first Mosley denied any

---

**1.** All emphasis is mine throughout unless otherwise noted.

**2.** The Fort Worth Court of Appeals says:
"In the *Mosley* decision, the Supreme Court determined that the 'critical safeguard' identified in the *Miranda* passage addressing the accused's right to silence is the accused's right to cut off questioning.' 423 U.S. at 103, 96 S.Ct. at 326, 46 L.Ed.2d at 321."
*Watson,* supra, at 871.
This Court is more elaborative, *viz:*
"The 'right to cut off questioning' is among the procedural safeguards established by *Miranda,* 384 U.S. at 474, 86 S.Ct. at 1628. This particular right, established as a 'critical safeguard' of the Fifth Amendment right to remain silent, *Mosley,* 423 U.S. at 103, 96 S.Ct. at

326, requires the police to immediately cease interrogating a suspect once the suspect 'indicates in any manner, at any time ... during questioning, that he wishes to remain silent.' *Miranda.* 384 U.S. at 473–74, 86 S.Ct. at 1627–28; *Mosely,* 423 U.S. at 100, 96 S.Ct. at 325."
Opinion, at 596.
It must be understood that "critical safeguard" comes only from the opinion in *Michigan v. Mosley,* which in turn is taking "right to cut off questioning" from *Miranda,* 384 U.S., at 474, 86 S.Ct., at 1627; in other words, in the *Miranda* "passage" alluded to in *Mosley,* the Supreme Court did *not* use the term "critical safeguard." *Mosley* alone applied that gloss.

involvement in the Williams murder, but when told that Anthony Smith had named him as "shooter" in a confession, Mosley made a statement implicating himself in the killing. That exchange lasted some fifteen minutes, during which Mosley did not ask to consult with a lawyer or indicate he did not want to discuss the homicide. *Id.*, 423 U.S., at 97–98, 96 S.Ct., at 323–324.

Before trial on an information charging him with first degree murder, Mosley moved to suppress his incriminating statement taken by Detective Hill on grounds, *inter alia*, that under the doctrine of the *Miranda* case it was constitutionally impermissible for Detective Hill to question him about the Williams murder after he had indicated to Detective Cowie that he would not answer any questions about the robberies. The trial court denied his motion, the statement was admitted in evidence at trial, a jury found him guilty as charged and the court imposed mandatory sentence of life imprisonment.

On appeal the Michigan Court of Appeals held that Hill's interrogation of Mosley was a *"per se* violation of the *Miranda* doctrine," and reversed, *People v. Mosley*, 51 Mich.App. 105, 214 N.W.2d 564 (1974);[3] further review was denied by the Michigan Supreme Court, 392 Mich. 764 (1974). *Id.*, 423 U.S., at 98–99, 96 S.Ct., at 324.

Having granted certiorari, the Supreme Court framed its issue as follows:

"[W]hether the conduct of the Detroit police that led to Molsey's incriminating statement did in fact violate the *Miranda* 'guidelines,' so as to render the statement inadmissible in evidence against Mosley at his trial."

*Id.*, 423 U.S., at 100, 96 S.Ct., at 325. Resolution of the question turned "almost entirely" on its own interpretation of that now ubiquitous "passage" in the *Miranda* opinion, *viz:*

"Once warnings have been given, the subsequent procedure is clear. If the individual *indicates in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown *that he intends to exercise his* Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege as been once invoked."

*Miranda,* supra.

The Supreme Court began an analysis of that passage by noting it states "that 'the interrogation must cease' when the person in custody *indicates* that 'he wishes to remain silent,'" but "it does not say under what circumstances, if any, *a resumption of questioning is permissible.*" *Id.*, 423 U.S., at 101, 96 S.Ct., at 325.

Significantly for our purposes here, the Supreme Court thus moved immediately from the subject of *when interrogation must cease* to the problem of circumstances under which questioning *may be resumed.* Because in his session with Detective Cowie Mosley declined to answer questions about robberies, and Cowie promptly ceased his interrogation, just as the Michigan Court of Appeals did, note 3, *ante,* so

---

**3.** The Michigan Court of Appeals stated factually: "According to Cowie, defendant did not request counsel, but did *decline to answer* 'any questions about the robberies.'" *Id.*, 214 N.W.2d, at 565. It then applied the law to that factual finding, *viz:*

"When defendant declined to answer Cowie's questions, *thus indicating that he wished to exercise his Fifth Amendment right to remain silent,* the interrogation should have ceased:

[quoting here the 'passage' from *Miranda* 384 U.S., at 473–474, 86 S.Ct., at 1627–1628, 16 L.Ed.2d, at 723]."

*Ibid.* As to the second interrogation, the court said, "[D]efendant was questioned further by Sergeant Hill after defendant had *indicated to Cowie that he wished to remain silent.*" *Id.*, 214 N.W.2d, at ·566. It concluded that exercise of the right to remain silent in the face of questions by Cowie extended to subsequent interrogation by Hill. The Supreme Court would accept the findings of the Michigan Court of Appeals—but not its ultimate conclusion. See *post,* at 611.

also the Supreme Court took his conduct to indicate a wish to remain silent.[4] The matter of "indicating a wish" never became an issue in the case, and beyond what it regarded as a refusal to answer questions, the Supreme Court was not called on to decide whether some other manner or another may or may not be appropriate to indicate a desire to remain silent.

Neither this Court nor the Fort Worth Court considers that aspect of *Mosley.* Yet, in context here "declining to answer" or "to talk" is synonymous with "remaining silent." So, the Supreme Court has answered the basic question posed by appellant in this cause; that is, whether a refusal to speak or to answer questions during police interrogation is any indication of a wish to remain silent. See Slip Opinion, at 11. Now all we have to do is determine whether a resumption of questioning by officers Myer and Shaw was permissible. That is the thrust of *Mosley.*[5]

Applying its analysis of *Miranda,* the Supreme Court found Mosley's right to remain silent was fully respected. It compared his situation to another, *viz:*

> "This is not a case, therefore, where the police *failed to honor a decision* of a person in custody to cut off questioning,

either by refusing to discontinue the interrogation upon request *or* by persisting in repeated efforts to wear down his resistance and make him change his mind. In contrast to such practices, the police here immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation."

*Id.,* 423 U.S., 105–106, 96 S.Ct. 327.

Because appellant "refused to talk" or to answer questions through two sessions of interrogation, whereas Mosley declined to answer any questions or to talk about robberies, but later relented on robbery-murder, the Fort Worth Court and then this Court confront a dilemma. The Supreme Court finds that by declining to answer anything about the robberies Mosley communicated his decision to remain silent. Nonetheless, in order to appropriate portions of *Mosley,* the Ft. Worth Court resorts to a notion that silence can be "insolubly ambiguous," to find that "to remain silent" is not enough "to cut off questioning," *Watson,* supra, at 872–875, while the opinion of this Court bypasses it and opts

---

**4.** In note 11, the Supreme Court pointed out that in their briefs to the Michigan Court (and to it), the parties "accepted Detective Cowie's account of the interrogation as correct, and the Michigan Court of Appeals decided the case on that factual premise;" also in their oral argument before the Supreme Court both counsel "discussed the case solely in terms of Cowie's description of the events," *viz:*

> "A. I think at that time he declined to answer whether he was involved.
> Q. He declined to answer?
> A. Yes. Anything about the robberies."

Michigan represented that "the questioning [by Cowie] ceased when defendant declined to talk about the robberies." Petitioner's Brief, at 4. In *United States v. Mandujano,* 425 U.S. 564, 96 S.Ct. 1768, 48 L.Ed.2d 212 (1976), writing for the Supreme Court, Chief Justice Burger read *Miranda* to mean that "a person in police custody has, of course, an absolute right *to decline to answer* any question, incriminating or innocuous, see *Michigan v. Mosley* [citation omitted][.]"

**5.** Continuing its analysis, the Supreme Court suggested several competing interpretations of the passage, and then rejected them for leading

to "absurd and unintended results." Upon those considerations it concluded:

> "... Clearly, therefore, neither this passage nor any other passage in the *Miranda* opinion can sensibly be read to create a *per se* proscription of indefinite duration upon *any further questioning by any police officer or any subject,* once the person in custody has indicated a desire to remain silent."

*Id.,* 423 U.S. at 102–103, 96 S.Ct., at 326. Because it believed that a reasonable and faithful interpretation of *Miranda* rests on an intention there "to adopt 'fully effective means ... to notify the person of his right of silence and to assure that his exercise of the right will be scrupulously honored,'" the *Mosley* Court "identified" the "critical safeguard" noted in the opinions of the Fort Worth Court and of this Court, see *ante,* at note 2, and ended this part with the result of its analysis, *viz:*

> "... We therefore conclude that the admissibility of statements obtained after the person in custody has *decided to remain silent* depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'"

*Id.,* 423 U.S., at 104, 96 S.Ct., 326.

to examine "totality of the circumstances," opinion, at 597. Those approaches lead us to digress into an exploration of that notion.

The underlying premise is that silence following *Miranda* warnings is "insolubly ambiguous," a term from *Doyle v. Ohio*, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976); similar remarks about silence at the time of arrest, even apart from effect of *Miranda* warnings, were made in *United States v. Hale*, 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), *in the course of weighing its probative value.*[6]

The question in each case involved use of postarrest silence to impeach a testifying accused. In *Hale*, decided under its supervisory powers, the Supreme Court held that because dubious probative value of such silence after *Miranda* warnings was outweighed by significant potential for prejudice, it was error to permit such impeachment. *Id.*, 422 U.S., at 180, 95 S.Ct., 2138.[7] However, in *Doyle*, the Supreme Court decided whether use of postarrest silence violates any provision of the Constitution. *Id.*, 426 U.S., at 616, 96 S.Ct., at 2244.

Writing for the Supreme Court, Justice Powell also noted: "Silence in the wake of these [*Miranda*] warnings may be nothing more than the arrestee's *exercise of these Miranda rights.*" *Id.*, 426 U.S., at 617, 96 S.Ct., at 2244. But the primary rationale for rejecting the State's position is that implicit in the warnings is assurance "that silence will carry no penalty." *Id.*, 426 U.S., at 618, 96 S.Ct., at 2245. Therefore, fully subscribing to views expressed by Justice White, see note 7 above, the Supreme Court held that use of silence for those purposes violates the Due Process Clause of the Fourteenth Amendment. *Id.*, 426 U.S., at 619, 96 S.Ct., at 2245.

Thus though silence was said to be "insolubly ambiguous" for impeachment purposes, in both cases the Supreme Court expressly recognized that once warned of his *Miranda* rights to remain silent and that anything he says may be used against him, by remaining silent an arrestee can thereby exercise that right, *Doyle*, 426 U.S., at 617, 96 S.Ct. 2244, indicating his reliance on the right to remain silent, *Hale*, 422 U.S., at 177, 95 S.Ct., at 2137.

*Doyle* is the seminal opinion on this matter of "implicit assurance." Subsequent opinions by the Supreme Court—none of which is mentioned by the Fort Worth Court—have consistently translated the "implicit assurance" of *Doyle* " 'that silence will carry no penalty,' " *Wainwright v. Greenfield*, 474 U.S. 284, 290, 106 S.Ct. 634, 638, 88 L.Ed.2d 623 (1986), into "a case where the government had *induced silence* by implicitly assuring the defendant that his silence would not be used against him," *Fletcher v. Weir*, 455 U.S. 603, 606, 102 S.Ct. 1309, 1311, 71 L.Ed.2d 490 (1982), and cases discussed therein.

---

**6.** That part of *United States v. Hale*, supra, quoted in the opinion of the Court at page 595 is about silence generally—"in most circumstances." But in context of absolute silence after *Miranda* warnings, the Supreme Court, speaking through Justice Marshall, was more direct, *viz:*

"Respondent, for example, had just been given the *Miranda* warnings and was particularly aware of his right to remain silent and the fact that anything he said could be used against him. Under those circumstances, his *failure to offer an explanation* during the custodial interrogation [as to where he got certain money] can as easily be taken *to indicate reliance on the right to remain silent* as to support an inference that the explanatory testimony was a later fabrication."
*Id.* 422 U.S., at 177, 95 S.Ct., at 2137.

**7.** In his concurring opinion Justice White planted the seed of due process that would become the *ratio decidendi* in opinions subsequently delivered, *viz:*

"... [W]hen a person under arrest is informed, as *Miranda* requires, that he may remain silent, that anything he says may be used against him ..., it seems to me that it does not comport with due process to permit *the prosecution during the trial to call attention to his silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time,* as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony. [citation omitted]. Surely Hale was not informed here that his *silence,* as well as his words, could be used against him. Indeed, *anyone would reasonably conclude from Miranda warnings that this could not be the case.* I would affirm on this ground."
*Id.*, 422 U.S., at 182–183, 95 S.Ct., at 2139–2140.

In *Wainwright v. Greenfield,* supra, accused pleaded not guilty by reason of insanity, an issue on which the prosecution had the burden of proof; at trial the prosecution introduced postarrest "silence" of Greenfield after he had been warned under *Miranda,* and during jury argument contended that his refusals to answer questions without first consulting an attorney demonstrated a degree of comprehension inconsistent with his claim of insanity. After his conviction was upheld on appeal and by a federal district court on habeas, the United States Court of Appeals reversed and under the reasoning of *Doyle,* held Greenfield was entitled to a new trial. 741 F.2d 329 (CA11 1984). Extending the implied promise of *Doyle* to use of "silence" as affirmative evidence against an accused to overcome his plea of insanity, the Supreme Court rejected all contrary arguments by the Florida Attorney General, and agreed with the Eleventh Circuit.

One contention was that comprehension of *Miranda* warnings, "as evidenced by his silence," is more probative of sanity than commission of the underlying offense; he argued that therefore "reliance on the 'insolubly ambiguous' character of the post-*Miranda* warnings silence in the *Doyle* opinion [citation omitted], is inappropriate in the context of an insanity defense." *Id.,* 474 U.S., at 293, 106 S.Ct., at 640. However, the Supreme Court found, "We need not evaluate the probative value of [Greenfield's] silence to reject this argument."

"... For the ambiguity of the defendant's silence in *Doyle* merely added weight to the Court's principal rationale, which rested on the implied assurance contained in the *Miranda* warning. See *South Dakota v. Neville,* supra, 459 U.S., [553] at 564–565, 103 S.Ct., [916] at 923–924 [74 L.Ed.2d 748 (1983) ]; *Jenkins v. Anderson,* 447 U.S. 231, 239–240, 100 S.Ct. 2124, 2129–2130, 65 L.Ed.2d 86 (1980). [note omitted]. The Attorney General's argument about the probative value of silence therefore fails entirely to meet the problem of fundamental unfairness that flows from the State's breach of its implied assurances."

*Id.,* 474 U.S., at 294, 106 S.Ct., at 640. The opinion ultimately concludes:

"In *Doyle,* we held that *Miranda* warnings contain an implied promise, rooted in the Constitution, that 'silence will carry no penalty.' [citation omitted]. Our conclusion that it was fundamentally unfair for the Ohio prosecutor to breach that promise.... requires us also to conclude that it was fundamentally unfair for the Florida prosecutor *to breach the officers' promise to respondent* by using his postarrest, post-*Miranda* warnings silence as evidence of his insanity. [note excerpted below]"

*Id.,* 474 U.S., at 295, 106 S.Ct. at 641. Before leaving *Wainwright v. Greenfield,* we should understand the definition of "silence," as intended and used by the Supreme Court, to wit:

"... With respect to post-*Miranda* warnings 'silence,' we point out that silence does *not* mean *ONLY MUTENESS;* it includes the statement of a desire to remain silent, as well as of a desire to remain silent until an attorney has been consulted."

*Id.,* 474 U.S., n. 13, at 295, 106 S.Ct., n. 13, at 641. Concurring in the result, Justice Rehnquist could not agree that *statements* of Greenfield following *Miranda* warnings, such as his request for a lawyer, should be treated "the same as *silence.*" *Id.,* 474 U.S., at 297, 106 S.Ct., at 642 (emphasis by Justice Rehnquist). His perception is that after being warned Greenfield did *not* remain silent in saying:

"I understand my rights. I do not want to speak to you. I want to speak to an attorney." ... [And then] "I appreciate that, thanks a lot for telling me that."

*Id.,* 474 U.S., at 300, 106 S.Ct., at 643. What he believed constituted a comment on silence in violation of *Doyle* is the following:

"[E]ven down at the station, accordingly to Detective Jolly—he's down there. He says, 'have you been read your *Miranda* rights?' 'Yes, I have,' 'Do you want to talk?' 'No.' 'Do you want to talk to an

attorney?' 'Yes.' And after he talked to the attorney again *he will not speak.*" *Ibid.*[8]

Thus we have seen that after *Doyle* through opinions leading to and summarized in *Fletcher v. Weir*, supra, 455 U.S., at 606, 102 S.Ct., at 1311, and on to *Greenfield*, the Supreme Court has avoided an "insolubly ambiguous" characterization of "silence" induced by *Miranda* warnings. As in *Greenfield*, any argument about the probative value of "silence" is irrelevant in that it "fails entirely" to meet the problem of fundamental fairness flowing from a breach of implied assurances in the warnings. *Id.*, 474 U.S., at 294, 106 S.Ct., at 640. In that context "silence" assured by *Miranda* is first "muteness."

In the instant cause, the facts of the custodial interrogation sessions are undisputed. At the outset of each an officer gave appellant the *Miranda* warnings, as did a magistrate between the first and second sets. In addition to the familiar *Miranda* litany, the particular warning read to appellant ended with an addition assurance, *viz:*

> "You can decide at any time to exercise these rights and *not answer any questions or make any statements.*"

II S.F. 57 and 96. It is equally undisputed that throughout two sessions Officer Myer and Detective Shaw put question after question to appellant but he "refused to talk," he "just sat silent." Later on in the afternoon, about 3:00 p.m., they took appellant from his cell for more questioning. Myer testified:

> "Q Had Mr. Watson said any word or given any indication to you that after having refused to talk on two prior occasions he changed his mind and wanted to talk on the third occasion?
>
> A He did when he answered the questions."

Appellant was thus thrust into a situation that is strikingly similar to what the *Mosley* Court envisioned would be offensive to *Miranda, viz:* officers did persist in "repeated efforts to wear down his resistance and make him change his mind;" they did not "immediately cease[ ] the interrogation;" they did not restrict subsequent interrogation "to a crime that had not been a subject of the earlier interrogation."[9]

Manifestly, the conduct of Grand Prairie police that led to appellant's incriminating statement did in fact violate assurances of *Miranda* warnings, so as to render his statement inadmissible in evidence against appellant at his trial.

Accordingly, for the reasons given *ante* the Fort Worth Court of Appeals did indeed err in holding as a matter of law that "an accused has an affirmative obligation to explicitly state his objection to further questioning in those situations [prescribed at 715 S.W.2d at 873]," and thus I would sustain appellant's ground for review. Because the Court finds error "under the

---

**8.** The prosecutor's allusion to "an attorney" is enigmatic in that neither opinion mentions one. However, the Court of Appeals reports that upon requesting an attorney Greenfield was counseled by a public defender, after which he "again" declined to talk with police. See 741 F.2d., at 330. Thus "silence" Justice Rehnquist would have ruled out is, by common usage, "forbearance from speech ...: MUTENESS." Webster's New Collegiate Dictionary (G. & . C. Merriam Company 1979).

**9.** The Fort Worth Court acknowledged that *United States v. Hernandez*, 574 F.2d 1362 (CA5 1978), accepted by this Court as persuasive in significant respects, opinion, at 598, n. 8, and 599, "appears to contradict this holding [that an arrestee has an affirmative obligation to explicity state his objection to further questions in certain situations];" however, it dismissed *Her-*

*nandez* as "not dispositive" in that it believed the Fifth Circuit "was never required to rule specifically on the question of whether silence is indicative of the accused's right to cut off questioning." 715 S.W.2d, at 873–874. Yet, writing for the *Hernandez* Court, Chief Judge Brown pointed out time and time again that Hernandez invoked his right to remain silent "through his refusals to cooperate"—by simply remaining silent. Not only did the Government concede he did "on earlier occasions" that morning, but the Fifth Circuit found: "Clearly Hernandez's silence was in response to notice that he had the right to remain silent and that any statement he made would be used against him." 574 F.2d, n. 9, at 1368, and accompanying text; also at 1369: "It is patently obvious that the police ignored Hernandez's repeated invocation of his right to remain silent."

circumstances," I join only the judgment of the Court.

McCORMICK, Judge, dissenting.

The majority holds that under the facts of this case the post arrest silence of appellant during custodial interrogation is tantamount to an invocation of his right to remain silent. As such, the majority holds that *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed2d 694 (1966), precludes use of appellant's statements made after this implied invocation. I cannot agree.

I recognize that the language in *Miranda* on the scope of the right to silence and the effect of its exercise is very broad:

"Once warnings have been given, the subsequent procedure is clear. If the individual *indicates in any manner*, at any time prior to or during questioning that he wishes to remain silent, the interrogation must cease. [Footnote omitted.] At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." 384 U.S. at 473–74, 86 S.Ct. at 1627–28, 16 L.Ed.2d at 723. (Emphasis in original).

Subsequent to *Miranda*, however, the United States Supreme Court has rejected literal interpretations of this passage in *Miranda* finding that such interpretations lead to "absurd and unintended results." *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 320 (1975). As the Supreme Court in *Mosley* pointed out:

"[A] blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogations, *regardless of the circumstances*, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." Id. (Emphasis added).

In the *Mosley* decision, the Supreme Court determined that the critical safeguard identified in the *Miranda* passage addressing the accused's right to silence is the accused's "right to *cut off* questioning." 423 U.S. at 103, 96 S.Ct. at 326, 46 L.Ed.2d at 321. (Emphasis added). The Supreme Court explained that it is "[t]hrough the exercise of *his option to terminate* questioning [that the accused] can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." 423 U.S. at 103–104, 96 S.Ct. at 326, 46 L.Ed.2d at 321. (Emphasis added). The Supreme Court has not enumerated the possible ways by which an arrestee may indicate his desire to remain silent and to cut off questioning, but no language in *Miranda* or its progeny provides that an accused's silence creates a presumption that he or she desires further interrogation to cease.

The Supreme Court has determined, however, that silence by the accused following his receipt of *Miranda* warnings "is insolubly ambiguous." *Doyle v. Ohio*, 426 U.S. 610, 617, 96 S.Ct. 2240, 2244, 49 L.Ed.2d 91 (1976). As Justice Marshall pointed out in *United States v. Hale*, 422 U.S. 171, 177, 95 S.Ct. 2133, 2137, 45 L.Ed.2d 99 (1975):

"At the time of arrest and during custodial interrogation, innocent and guilty alike ... may find the situation so intimidating that they may choose to stand mute. A variety of reasons may influence that decision. In these often emotional and confusing circumstances, a suspect may not have heard or fully understood the question, or may have felt there was no need to reply. [Citation omitted.] ... He may have maintained silence out of fear or unwillingness to incriminate another. Or the arrestee may simply react with silence in response to the hostile and perhaps unfamiliar atmosphere surrounding his detention. In sum, the inherent pressures of in-custody interrogation ... compound the difficulty

of identifying the reason for silence. [Footnote omitted.]"

As such, depending on the circumstances of a particular case, a suspect's act of remaining silent during custodial interrogation might be indicative of a desire to cut off questioning or it could be a failure to fully understand his right to terminate the interrogation. There are, however, other possible motives and reasons for the silence or unresponsiveness of an arrestee during police questioning—the accused may be curious to see what evidence the prosecution already has and what the prosecution might be willing to offer to lessen the severity of the possible punishment in return for cooperation or the individual may be formulating his alibi. See *Mosley,* 423 U.S. at 109, 96 S.Ct. at 329, 46 L.Ed.2d at 324, n. 1 (White, J., concurring).

Appellant and the majority fail to present *any* case in which an arrestee's mere silence during questioning has been held sufficiently indicative of his desire to cut off questioning that the interrogation must be terminated. Cases in other jurisdictions that directly address this issue, however, have found that the mere silence or unresponsiveness during an interrogation of a suspect who is fully aware of his rights does not require a termination of the interrogation. For example, in *Taylor v. Riddle,* 563 F.2d 133, 136 (4th Cir.), cert. denied 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed.2d 768 (1978), the Fourth Circuit expressly rejected appellant's argument "that an accused who remains silent, after being given his *Miranda* warning, signifies his election to remain silent and may not thereafter be questioned in anyway without proof of clear, intelligent and understanding waiver of his right to remain silent." 563 F.2d at 136. The court in *Taylor* based its ruling on its earlier holding in *Blackmon v. Blackledge,* 541 F.2d 1070, 1072 (4th Cir. 1976), that "where an accused is informed and understands his *Miranda* rights, and then submits to questioning without objection, he has waived his rights thereunder." *Taylor,* 563 F.2d at 136.

In *McClinnahan v. United States,* 454 A.2d 1340 (D.C.App.1982), cert. denied, 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 179 (1983), before making his confession, the defendant was absolutely silent during his arrest and the following two interrogation sessions, with the exception of his statement to the interrogating officer at the end of his first interview that he knew what his rights were and that he understood them. The first interrogation was 30 minutes long and was followed by an hour long investigation by a mobile crime lab technician of the blood on the defendant's hands and clothes. The second interrogation took place immediately after the crime lab investigation and lasted 45 minutes. During the first two interrogations, while the defendant sat mutely, the police officer was mainly trying to show the defendant the strength of the case they had against him. The third interview was conducted by a different police officer who had dealt with the defendant before and was held almost immediately after the second interrogation. The defendant agreed to talk in the third interrogation and subsequently confessed. The Court of Appeals for the District of Columbia, in its ruling to admit the confession, found that "total silence here by appellant, a calculating person sophisticated in the ways of police procedures [footnote omitted], cannot be deemed to have constituted an exercise by him of his right to remain silent and to terminate questioning, some affirmative action on his part was required to indicate he was indeed exercising his option under *Miranda* to terminate questioning so that the police would thereby be placed on notice that their questions should cease." 454 A.2d at 1347.

At least two other state supreme courts have also found that an accused's silence during custodial interrogation does not necessitate the termination of questioning. See *State v. House,* 54 Ohio St.2d 297, 376 N.E.2d 588 (Ohio 1978) and *State v. Perkins,* 219 Neb. 491, 364 N.W.2d 20, 23 (1985). Indeed, in order to reach their holding, the majority overrules "to the extent [it] is in conflict," a recently decided case from this very Court. See *Sawyers v. State,* 724 S.W.2d 24 (Tex.Cr.App.1986).

In *Sawyers,* the defendant was arrested, Mirandized and, in the twenty minutes that

it took to transport him to jail, began answering police officer's questions. Certainly, in *Sawyers*, the defendant's silence upon initially receiving his *Miranda* warnings cannot, in any fashion, be recognized as an invocation of a right to remain silent. See *Taylor v. Riddle*, 563 F.2d 133, 136 (4th Cir.), cert. denied, 434 U.S. 1020, 98 S.Ct. 744, 54 L.Ed2d 768 (1977); *McClinnahan v. United States*, 454 A.2d 1340 (D.C. App.1982), cert. denied, 464 U.S. 867, 104 S.Ct. 205, 78 L.Ed.2d 179 (1983); *State v. House*, 54 Ohio St.2d 297, 376 N.E.2d 588 (Ohio 1978); *State v. Perkins*, 219 Neb. 491, 364 N.W.2d 20, 23 (1985). As such, this Court needlessly casts doubt on a case correctly decided and distinguishable on the facts.

Thus, an accused's act of remaining silent during custodial interrogation may be interpreted in a variety of ways and whether an accused's silence is indicative of his or her desire to cut off questioning will depend on the totality of circumstances apparent in each case. See *North Carolina v. Butler*, 441 U.S. 369, 374–375, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286, 293 (1979). As such, the trial court was responsible for determining precisely the significance of appellant's silence understanding that *"Miranda* should not be read so strictly as to require the police to accept as conclusive any statement or act, no matter how ambiguous, as a sign that the suspect desires to cut off questioning." *State v. Woods*, 374 N.W.2d 92, 99 (S.D.1985). Here the trial court found appellant's statement to be admissible into evidence.

The implied finding, on the trial court's part in this case, is that appellant's silence was not an invocation of his right to remain silent. The record supports such a finding. Prior to each of the four interrogation sessions, appellant was read his *Miranda* warning and indicated that he understood those warnings. There is nothing in the record to indicate that appellant was incapable of understanding his rights—appellant has made no such claim either in the trial court or on appeal. Appellant is no neophyte to the criminal process; he has a prior conviction for aggravated robbery. There is nothing in the record to suggest that appellant could not have simply told the officers that he wished to remain silent. Therefore, because the record supports the trial court's findings that appellant's mere silence was not indicative of an invocation of his right to remain silent, I would find that the trial court did not err in allowing appellant's statements into evidence.

Because of the foregoing I respectfully dissent.

CAMPBELL and WHITE, JJ., join in this dissent.