**AFFIRMED; Opinion Filed July 28, 2017.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-16-00970-CR

### CLEOFAS ALEJANDRO RUIZ, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-80461-2016**

## MEMORANDUM OPINION

Before Justices Lang, Myers, and Stoddart
Opinion by Justice Myers

Appellant Cleofas Alejandro Ruiz was convicted following a trial before the court of continuous sexual abuse of a child under the age of fourteen, and punishment was assessed at twenty-seven years' imprisonment. In two issues, appellant argues the trial court erred by admitting a written confession and that the evidence is insufficient to support the conviction. We affirm.

### BACKGROUND

The complainant in this case, B.O., fifteen years old at the time of trial, testified that she was about four or five when appellant, her stepfather, moved into the home she shared with her mother, Sara, and her younger sister. For the first few years, Sara, appellant, and their newborn daughter shared one of the three bedrooms in the home, appellant's son and nephew shared another room, and B.O. and her younger sister shared the third room. B.O. was not sure where

appellant's teenaged daughter Rebeca slept when she stayed with them, but B.O. thought it was probably the boys' room. Although B.O. and her younger sister had bunk beds, they often slept together in the bottom bed because neither one liked sleeping on the top bed. When they shared a bed, B.O. would sleep on the outside; her sister slept next to the wall. Her sister was a sound sleeper and difficult to wake up.

Beginning when B.O. was six or seven, appellant started doing things to her that made her feel uncomfortable. The first instance of sexual abuse B.O. could recall occurred in her room when her sister was sleeping next to her. She remembered "[g]etting touched and stuff while I was trying to sleep," and that appellant's hands and mouth touched her vagina and face. She would not usually hear him come into the room, but would wake up while things were happening. B.O. testified that there were times when appellant would take off her clothes; at other times he would pull up her nightgown or shirt. If she was covered by a blanket, appellant removed it. He would spread her legs and touch her vagina. He would also rub her vagina with his hand. Appellant used the tips of his fingers to part and touch the inside of the "lips" of the vagina, but B.O. did not recall anything ever going in her vagina. Rubbing was primarily what appellant would do to her. The sexual abuse happened both over and under her clothes, and there were times when her eyes were open and times when they were closed. If she rolled over or moved her arms, appellant would stop.

The sexual abuse occurred between three to five nights a week, and went on for more than two years. B.O. did not remember exactly how long the sexual abuse went on, but she knew it happened before she turned fourteen years old. She recalled one occasion when appellant was in the room, she opened her eyes, and his mouth was down by her vagina. B.O. testified that she could feel his mouth touching her vagina, and that he was using his tongue. When she moved appellant stopped. Another time, B.O. heard appellant's pants unzip and felt his penis touching

her mouth.

When she and appellant were at home and her mother was at work, there were times when appellant would dress B.O. in one of his T-shirts, her mother's high heels, and her stockings or socks, and have her walk over to the door and bend over. Sometimes she was not wearing underwear when she did this. Appellant would have her lie on the bed, put a pillow over her face, and spread her legs. She testified that appellant was holding a cellphone as he did this, and would tell her he wanted to show her mother how good she looked in her clothes. One time when appellant and B.O. were lying on her parents' bed watching a movie, appellant grabbed her hand and had her rub his penis over his clothes. B.O. testified that she could feel appellant's penis and that it felt "[h]ard." Asked how long appellant kept her hand there, B.O. said, "Not long."

B.O.'s biological father first learned about the sexual abuse in December of 2015, when he was driving her home from counseling. That day, B.O.'s boyfriend had written a text message to her saying he did not like appellant, which B.O. read aloud. Her father asked why her boyfriend did not like appellant, and B.O. said it was because appellant touched her when she was younger. Her father talked to B.O.'s counselor, Vilma Cea, a licensed marriage and family therapist. B.O. told Cea about what had happened using, as B.O. explained, "just general statements," and not providing any details. Cea then called Child Protective Services.

Rachel McConnell of the Collin County Children's Advocacy Center conducted B.O.'s forensic interview, which was recorded on December 21, 2015, and published to the trial court. McConnell testified that B.O. talked about appellant touching and rubbing the top part her vagina with his hand on a regular basis. B.O. described an incident where she woke up and appellant's penis was on her lips. B.O. talked about how she usually kept her eyes closed because she was scared but she would sometimes open them slightly, and she had seen appellant two or three

–3–

times. B.O. also described various instances of sexual abuse that occurred before she was fourteen years old. She talked about having to touch appellant's penis with her hand while they were watching television on her parents' bed. She described having to dress up in a T-shirt and high heels and bending over. Appellant would also hold a cell phone, cover her face with a pillow, and tell her he wanted to show her mother what she looked like. McConnell testified that B.O.'s "story always remained the same" and "[s]he never changed her story while we were in there," yet "[a] lot of her memories were all tied together." She was not able "to break down a lot of instances and give . . . a beginning to end" or walk the interviewer through "a whole time line," but she could "talk about different offenses or different types of sexual abuse." B.O. was likewise able to describe things that happened to her body that she remembered, heard, and saw. McConnell explained this was not unusual because sexually abused children often have a difficult time separating recurring events, and they only "remember specific events because something different happened or something about that event was flagged in [their] head."

The forensic interviewer was also asked whether it concerned her that B.O. never said anything to her about appellant placing his mouth on B.O.'s sexual organ, which she described in her testimony. McConnell said this did not concern her, explaining:

> Kids remember things differently. It all goes back to that disclosure process. You know, as she's going through and talking about what happened with me, it could trigger other memories after she leaves the interview and starts processing just the entire situation. Other things could come up as time goes on. She might feel more comfortable talking to someone else. Or she might just feel more comfortable talking about it in general. And she might be in a different stage of disclosure.

Sergeant Russell Driver, a criminal investigator with the Collin County Sheriff's Office, arrested appellant and transported him to an interview room in the Collin County Sheriff's Department, providing him with a copy of the statutory warnings on a pre-printed form. Upon being taken into custody, appellant agreed to talk to Driver. Once they were in the interview

–4–

room, Sergeant Driver administered the *Miranda* warnings to appellant, and appellant indicated he understood his rights and participated in the approximately two-and-one-half hour interview that followed. During the interview, which was video recorded and admitted at trial, appellant explained that he met B.O.'s mother, Sara, in approximately 2005, when B.O. was about five years old. Appellant shared a home in Collin County with Sara and his children and stepchildren, which included his stepdaughter B.O. and her younger sister. Appellant and Sara remained together for about ten years. At the time of appellant's interview on December 22, 2015, they had been separated for approximately three months.

Sergeant Driver testified that, during the interview, appellant said he would go into the girls' bedroom almost every night to check on them, and he would pull down and straighten out B.O.'s legs before pulling up the blanket. While straightening out the blanket and pulling down or straightening B.O.'s legs, appellant started looking at her female sexual organ and, at some point, he accidentally touched the "top part" of her "vagina area." According to appellant, this occurred about five times over a period of several years. Appellant said he touched B.O. for only a second, but he denied touching her skin directly. He also denied that touching her excited him. Driver testified that appellant said he felt "really dirty" after touching B.O. Appellant also stated, according to Driver's testimony, that touching the child once was as bad as touching her a thousand times, and it was wrong to touch her even for a second.

Sergeant Driver drew a picture of a vagina and asked appellant to draw a box around the area where he touched B.O. Appellant drew the box around the upper portion or pubic area of the vagina and scribbled out the lower end to indicate he never went towards the "hole" area of the vagina or put his finger inside it. The sergeant testified that he asked appellant if he could see B.O.'s female sexual organ, and appellant stated he could not, which made no sense to Driver given what appellant had said. Appellant also told Driver that he never touched the other girls in

the way that he touched B.O.

Appellant denied putting his penis on B.O.'s mouth. He admitted giving her T-shirts and, at other times, high heels to wear, but denied making her pose sexually. Appellant explained that B.O. could wear her mother's shoes and that dress shoes and hosiery were more appropriate attire for church and other formal occasions.

Driver asked appellant, "Do you think [B.O.'s] lying to us?" Appellant replied, "I mean, not about this." He added: "I don't think she lie. And I don't think she's making [it] up. But I think [she] confused things." Appellant also stated that B.O. had lied to her biological father and mother in the past, but had never lied about him.

Appellant said it was difficult for him to listen to what was being said about him and to think he had done that. Toward the end of the interview, the sergeant gave appellant an opportunity to write an "apology" letter to B.O. Driver explained that the letter should be in appellant's words and contain whatever he wanted to say to B.O. Driver then left the room for approximately fifteen minutes while appellant started writing a letter to B.O., which was admitted at trial. When Sergeant Driver returned to the room, appellant continued writing for a few more minutes. Appellant finished writing and handed the letter to Driver, and the sergeant read the letter aloud to appellant. In the letter, appellant stated, in part, that when B.O. was younger he tried to do his job as a parent and as a man of the house, and that

> many times you were out of the blankets very cold in a corner and I used to pull the blankets out from under you and tried to cover you with it, trying to pull your legs and yourself straight on the bed because you were cold and sometimes I touch you accidentally, but I did it again, up untill [sic] I think it was enough and stop it. . . .

Appellant concluded the letter by asking for her forgiveness and saying he was "REALLY SORRY" and that he would always love her. After he handed the letter to Sergeant Driver to read, appellant said he "didn't try to say something graphic because she's still young." Driver

asked appellant if he used the word "accidentally" in the letter because of B.O.'s age. Driver noted that appellant had admitted to touching B.O. approximately five times and that it was not an accident when appellant touched her five times. Appellant said, yes, he used that word because she was still young, and that he did not mean to hurt B.O. The sergeant told appellant he did not want the child to look at the letter and think "she was the wrong person in all of this." Driver also asked, "But that's what you meant when you told me that you softened it up; you didn't go into graphics?," to which appellant said "yeah, yeah, yeah."

Based on his training and experience, Driver felt that appellant had minimized the sexual abuse he was willing to admit. Asked why he believed appellant would do this, the sergeant recalled that when he asked appellant a question, he would divert the question to a different answer, and that although appellant referred to the abuse as an accident, he also agreed it was not an accident. In Driver's opinion, appellant's description of what occurred indicated he had penetrated B.O.'s female sexual organ, although neither appellant nor the victim used the word penetration. Driver noted that he had the information from the victim's forensic interview. He also referred to the diagram where appellant drew a box to indicate where he touched B.O., and that if appellant touched that part of B.O. with his entire hand and fingers "he would have to touch the line that separated it." The sergeant also said that if appellant was rubbing B.O. he would actually have been pushing down on the female sexual organ, which would have broken "the plane of the top part anyway."

Sara, B.O.'s mother, testified that she and appellant had been married eight years and that they were still married at the time of trial, but she had filed for divorce. Sara testified that B.O. shared a room with her younger sister, and that they had bunk beds but did not always sleep in their separate beds. B.O. got her own room when she was approximately nine years old. While they shared a room, B.O. woke up easily while her sister was hard to wake up. Sara confirmed

that, at night, she and appellant would get up and check on the children to make sure they were covered with blankets but that appellant did this more often. She would wake up and find appellant gone from the bed, and "a handful of times" she went to check on the girls and found appellant already there, standing by the bunk beds. She never noticed anything suspicious, but added that he probably heard her coming because the floors creaked. When Sara would ask appellant what he was doing, he said he was covering up the girls. When she was seven or eight years old, B.O. told Sara and her biological father, Lee, that appellant would come into her room and pull up her nightgown. Sara and Lee tried to get more information from her, but the child "didn't say anything else to us other than [appellant] pulled her nightgown up." When asked about this, appellant "said he was just covering her up," and Sara and Lee decided B.O. must have misunderstood what was happening and did not contact the authorities. Sara testified that she first learned about the sexual abuse at the counselor's office on December 17, 2015. She admitted that B.O. had a problem with "telling stories" or exaggerating when she was younger—from approximately age six until she was around seven or eight years of age—but this stopped when B.O. was around nine or ten and it was no longer an issue.

Lee testified that he and Sara were married in 1994 and divorced amicably in 2005. They had two children together—B.O. and her sister. Lee married another woman in 2011, but they were divorcing at the time of trial and Lee and Sara had started dating again. Lee testified that several years earlier, B.O. had said something about some interactions with appellant, but she did not give any details and Lee thought she just "misunderstood what was happening," so he took no action. Then, after Lee and B.O. had left her counselor's office, she read to him a text message from her boyfriend that said, "I don't like [appellant] for what he's done to you." When Lee asked B.O. what this meant, "she said for that stuff whenever he touched me." Lee asked if she was talking about "from before," and B.O. said "yeah." Lee told B.O. that she would not

"give us a straight answer . . . back then," and she said she was scared.  B.O. did not provide any further details at that point.

Lee reported what he had learned to Sara and then told B.O.'s counselor, who talked to B.O.  Lee admitted that he had said B.O. had a problem with making things up and exaggerating, but when defense counsel asked if that was one of her more pronounced characteristics, Lee stated, "No."  Lee testified that B.O. had had a "tough time" when he and Sara separated and appellant "came into the picture," but that the child "was just telling stories."  He said the only thing he remembered her exaggerating was that they once left her alone with a next door neighbor, "which wasn't the case."  He added, "But that was it."  Lee testified that B.O. did not currently have any issues with lying.

The defense argued that B.O. fabricated the allegations against appellant to aid her mother in her divorce proceedings against appellant.  It also questioned B.O.'s credibility and the credibility of her story, and challenged whether appellant could have sexually abused B.O. for such a long period of time when so many people were living in the house.  Twenty-three-year-old Rebeca, appellant's biological daughter, testified, for example, that she lived in the house with appellant and Sara for about a year and a half and that she slept in the girls' bedroom and never saw appellant molesting B.O.  According to Rebeca, B.O. had a bad reputation for being honest and she was frequently caught telling lies.

On cross-examination, Rebeca admitted that when she lived with appellant and Sara, she went to school during the day and worked at night, and that she would get home at around 10:00 or 11:00 p.m.  B.O. and her sister usually went to sleep at about 9:00 p.m.  Rebeca also testified that she would fall asleep on the couch and usually got up and went into the girls' room at around midnight, where she slept on the top bunk bed.  Rebeca agreed there were opportunities for appellant to have committed the offenses when she was not present.  She saw appellant come

into the room at night, but explained that it was to turn off the lights or the fan and to cover the girls with blankets. When asked if she knew whether appellant would move the girls' legs, Rebeca replied: "I don't know. I wasn't at the bottom of the bed." She also said, "I mean, I couldn't see anything because it's a bunk bed." She agreed she had no idea what appellant did or did not do when he was in the room, and that she "would just see him go in and put the covers on and leave the room."

Other defense witnesses similarly testified that B.O. had a poor reputation for honesty. Appellant's twenty-five-year-old son, Ricardo, testified that he lived with appellant and Sara from about 2007 until 2009 and that, during that time, B.O. had a bad reputation for honesty. Ricardo also noted that B.O. had nearly gotten him into trouble once, but had gotten caught. B.O.'s stepmother, Donna, who was then married to but divorcing Lee, B.O.'s biological father, testified that she saw B.O. regularly beginning in 2008 because she would stay one week with appellant and Sara and one week with her and Lee. In Donna's opinion, B.O. had a reputation for not being honest. Donna admitted that she had not spoken to B.O. since July of 2015, and that she was unfamiliar with B.O.'s reputation for truthfulness at the time she made her outcry.

The trial court ultimately found appellant guilty of continuous sexual abuse of a child younger than fourteen years of age, as charged in the indictment, and assessed punishment at twenty-seven years' imprisonment. This appeal followed.

### DISCUSSION

### 1. Admission of Custodial Statements

In his first issue, appellant contends the trial court erred by admitting his "written confession" over the objection of defense counsel. While appellant does not dispute that he was informed of his rights under *Miranda* and article 38.22, nor does he contend he did not understand those rights, he argues that he never actually waived them. Appellant acknowledges

that an express waiver of rights was not required, but he asserts that "this situation is not as straightforward as, was there an implied waiver in the absence of an express waiver?" Appellant argues that his conduct in not initialing the three blank spaces next to the waiver language on the form and not verbally stating that he was waiving his rights amounted to an "express refusal" to waive his rights.

The record shows that after appellant was arrested and transported to an interview room in the Collin County Sheriff's Department, he was provided with a copy of the statutory warnings on a pre-printed form. At the beginning of the interview, Sergeant Driver commented that appellant spoke English well, and appellant stated that he could read English better than he could speak it. Appellant then read aloud, "word for word," all of the rights and warnings on the form in English. Appellant told the sergeant he understood what he had just read. Driver read each of the five rights aloud to appellant, and after each one appellant either verbally stated or agreed that he understood the right, and he signed his initials next to each right. Driver testified that he made sure he thought appellant understood each warning before moving on to the next one.

After reviewing the statutory warnings with appellant, Sergeant Driver summarized them as follows: "So, understanding all these rights, okay, I'm not gonna promise you anything; I'm not gonna torture anybody. I just want to talk, ok? Because there's always two sides to a story." Appellant said, "Okay." The sergeant added, "And so you understand that, right?" Appellant said, "Yes, sir." Driver said, "Okay." He also said, "And I'm not promising you any favors or nothing," to which appellant shook his head and said "no" several times. The sergeant asked appellant to sign his name at the bottom of the form, and appellant signed it.

Appellant did not initial the three blanks on the form associated with the additional "waiver" language set out after the five statutory rights, and Driver did not ask appellant to do

–11–

so. Nor did he specifically review them with appellant. Driver suggested in his testimony that appellant did not need to sign the blank lines next to the waiver language because they were all located under the fifth *Miranda* right, which appellant had already initialed. The form appears in part as follows:

```
  CAR      (1)   I have the right to remain silent and not make any statement at all and that
                 any statement I make may be used against me at my trial;
  CAR      (2)   Any statement I make may be used as evidence against me in court;
  CAR      (3)   I have the right to have a lawyer present to advise me prior to and during
                 questioning;
  CAR      (4)   If I am unable to employ a lawyer, I have the right to have a lawyer appointed
                 to advise me prior to and during any questioning; and
  CAR      (5)   I have the right to terminate the interview at any time.
                 I understand each of these rights as set out above.
                 Understanding my rights, prior to and during the making of this statement, I
                 agree to knowingly, intelligently and voluntarily waive the rights set out
                 in the warning stated above.
                 I declare that the following statement is made of my own free will and without
                 promise of hope or reward, without fear or threat of physical harm, without
                 coercion, without favor or offer of favor, without leniency or offer of
                 leniency, without any inducement whatsoever, by any person or persons
                 whomsoever.


I have read each page of this statement consisting of _____ pages(s), each page of which
bears my signature, and corrections if any, bear my initials, and I certify that the facts
contained herein are true and correct. I further certify that I have made no request for the
advice or presence of a lawyer before or during any part of this statement, nor at any time
before it was finished did I request that this statement be stopped. I also declare that I
was not told or prompted what to say in this statement.

This statement was completed at   3:00    P.M.  on  the   22    day of
DECEMBER , 2015.

WITNESS: SGT. RUSSELL DRIVER #707

WITNESS:_____
                                       Signature of person giving vol...    STATE'S
                                                                            EXHIBIT
Rev. 7/98                      Page _____ of _____                              9
```

While appellant did not verbally state that he was waiving his rights, he began speaking with the sergeant freely and without hesitation after signing the form, and this continued for the approximate two-and-one-half hour length of the interview. At no point did appellant ask to

–12–

speak to an attorney or ask to stop the interview.

Sergeant Driver testified that he neither promised appellant anything for his statements nor coerced or threatened him to give any statements. Appellant had no trouble communicating, appeared to understand, and asked questions if he did not. After speaking with Driver, appellant voluntarily wrote the letter to B.O., according to Driver's testimony.

When the State offered the video recording of the interview, appellant objected under article 38.22 of the Texas Code of Criminal Procedure, arguing that "there's clearly a receipt of the information and understanding of it. But there is no waiver, which is further compounded by the fact that those blanks to initial the waiver are left blank . . . ." The State replied that neither a written nor an oral waiver is specifically required for a valid waiver of *Miranda* rights, and that the video recording showed appellant understood his rights and wanted to talk. After watching the video, which showed Driver administering the statutory warnings to appellant, the trial court overruled appellant's objections and admitted the video recording and the signed statutory warnings.

We review a trial court's decision regarding the admissibility of evidence under an abuse of discretion standard. *See, e.g., Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007); *Winegarner v. State*, 235 S.W.3d 787, 790 (Tex. Crim. App. 2007). The trial court's ruling will be upheld if it is within the zone of reasonable disagreement and correct under any theory of law applicable to the case. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008); *Winegarner*, 235 S.W.3d at 790.

Article 38.22 governs the admissibility of statements made by a defendant during custodial interrogation in a criminal proceeding. *Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (citing TEX. CODE CRIM. PROC. ANN. art. 38.22). Article 38.22 requires that a defendant be provided with warnings virtually identical to those required by *Miranda*, but also

–13–

that the accused has the right to terminate the interview at any time. *Id.* It further provides that an oral statement is admissible against a defendant in a criminal proceeding if, among other things, the defendant "knowingly, intelligently, and voluntarily" waived the rights set out in the warnings. *Id.*

The State has the burden of showing a defendant knowingly, intelligently, and voluntarily waived his rights under *Miranda* and article 38.22 by a preponderance of the evidence. *Leza v. State*, 351 S.W.3d 344, 349, 351 (Tex. Crim. App. 2011). In evaluating whether an individual waived his rights, courts look at (1) whether the waiver was made voluntarily, which is defined as being a product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) whether the waiver was made with full awareness of both the nature of the rights being abandoned and the subsequent consequences of that decision. *Id.* at 349–50, 352. Such an evaluation involves the totality of the circumstances, which requires the consideration of all the circumstances surrounding the interrogation, including the defendant's experience, background, and conduct. *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010).

A waiver can be expressly made or implied by the accused's conduct. *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010); *Joseph*, 309 S.W.3d at 24. An implied waiver can be established upon a showing that the accused (1) was given the proper warnings; (2) understood the warnings and their consequences; and (3) made an uncoerced statement. *Berghuis*, 560 U.S. at 382–85; *Leza*, 351 S.W.3d at 354 n.33; *Howard v. State*, 482 S.W.3d 249, 256 (Tex. App.— Houston [1st Dist.] 2015, pet. ref'd); *Hernandez v. State*, 387 S.W.3d 881, 885 (Tex. App.—San Antonio 2012, no pet.). In *Berghuis*, the Supreme Court noted that "[t]he main purpose of *Miranda* is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel." *Berghuis*, 560 U.S. at 383; *see Hernandez*, 387 S.W.3d at 885. Therefore, "[a]s a general proposition, the law can presume that an individual who, with a full

understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385; *see also Watson v. State*, 762 S.W.2d 591, 601 (Tex. Crim. App. 1988) (en banc) ("the general rule is that neither a written nor an oral express waiver is required"). The *Berghuis* court summarized its holding by stating, "In sum, a suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Berghuis*, 560 U.S. at 388–89.

The record in this case shows that appellant willingly shared his version of events with Sergeant Driver immediately after receiving and acknowledging his understanding of the *Miranda* and article 38.22 warnings. At no time during the approximate two-and-one-half hour interview did appellant ask to stop the interview or ask for counsel. In addition, appellant makes no allegations of coercion, nor does he argue that he did not understand the warnings. Indeed, appellant read the warnings aloud and said he understood them, after which Sergeant Driver read the warnings aloud to appellant, and appellant verbally agreed or otherwise indicated that he understood those rights. Appellant also signed his initials next to each of the five rights, and he signed his name at the bottom of the form. The fact that appellant neither signed his initials next to the waiver language on the form nor explicitly stated he was waiving his rights does not mean that he invoked his *Miranda* rights. *See, e.g., U.S. v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011) ("[A] refusal to *waive* rights, however unequivocal, is not necessarily equivalent to an unambiguous decision to *invoke* them."). As the court of criminal appeals stated in *Joseph*, "[a]ppellant's objection to the absence of a written or articulated waiver runs contrary to 'the general rule . . . that neither a written nor an oral express waiver is required.'" *Joseph*, 309 S.W.3d at 24 (quoting *Watson*, 762 S.W.2d at 601). A waiver need not assume a particular form and, in some cases, a waiver can be clearly inferred from the actions and words of the person

interrogated.  *See id*.  This is such a case.

Based on the totality of the circumstances, the trial court could have reasonably concluded that appellant knowingly, intelligently, and voluntarily waived his rights under *Miranda* and article 38.22.  As a result, the trial court did not abuse its discretion by admitting appellant's custodial statements into evidence.  We overrule appellant's first issue.

## 2. Sufficiency of the Evidence

In his second issue, appellant argues the evidence is insufficient to support the conviction.  He contends that fact witnesses who had personal knowledge of B.O.'s reputation for truthfulness testified she lied and was untruthful.  Appellant also argues the State offered no testimony that verified any of B.O.'s allegations, and that there were conflicts between some of B.O.'s statements and the testimony of other witnesses.

In reviewing the sufficiency of the evidence, we consider all evidence in the light most favorable to the jury's verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Acosta v. State*, 429 S.W.3d 621, 624–25 (Tex. Crim. App. 2014).  It remains the factfinder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and to draw reasonable inferences from basic to ultimate facts.  *Jackson*, 443 U.S. at 319.  We do not reevaluate the weight and credibility of the evidence and then substitute our judgment for that of the factfinder.  *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).  Instead, we determine whether the necessary inferences are reasonable based on the cumulative force of the evidence when viewed in the light most favorable to the verdict.  *See Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011).

A person commits the offense of continuous sexual abuse of a child if, during a period that is thirty or more days in duration, he commits two or more acts of sexual abuse and, at the

time of the commission of each act, he is seventeen years of age or older and the victim is a child younger than fourteen years of age. TEX. PENAL CODE ANN. § 21.02(b). Although the exact dates of the abuse need not be proven, the offense does require proof that two or more acts of sexual abuse occurred during a period of thirty days or more. *Baez v. State*, 486 S.W.3d 592, 595 (Tex. App.—San Antonio 2016, pet. ref'd); *see* TEX. PENAL CODE ANN. § 21.02(d) (jury not required to unanimously agree on which specific acts of sexual abuse were committed by defendant or exact dates when those acts occurred, but jury must agree unanimously that defendant, during period of thirty or more days, committed two or more acts of sexual abuse). The statute defines an "act of sexual abuse" as including:

> (2) indecency with a child under Section 21.11(a)(1), if the actor committed the offense in a manner other than by touching, including touching through clothing, the breast of a child;
>
> (3) sexual assault under Section 22.011;
>
> (4) aggravated sexual assault under Section 22.021[.]

*Id.* § 21.02(c)(2)–(4). The testimony of a child victim alone is sufficient to support a conviction for continuous sexual abuse of a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07; *Lee v. State*, 186 S.W.3d 649, 656 (Tex. App.—Dallas 2006, pet. ref'd). Further, the penal code does not require that a child victim be specific about the dates the abuse occurred. *See Dixon v. State*, 201 S.W.3d 731, 736 (Tex. Crim. App. 2006); *Vazquez v. State*, Nos. 05–12–00548–CR, 05–12–00549–CR, 2013 WL 5614300, at *5 (Tex. App.—Dallas Oct. 14, 2013, no pet.) (mem. op., not designated for publication). This is because it is not often that a child knows, even within a few days, the date she was sexually assaulted. *See Sledge v. State*, 953 S.W.2d 253, 256 n.8 (Tex. Crim. App. 1997).

Appellant's arguments about the sufficiency of the evidence focus largely on B.O.'s credibility or various conflicts in the evidence. Appellant suggests, for example, that the trial

court could not have found B.O. credible because the only evidence of her credibility showed she was untruthful. Yet, other evidence showed B.O. was a poor liar who would get caught after admitting she had lied, that any propensity to "tell stories" or exaggerate subsided as B.O. grew older, and that she no longer had a problem with untruthfulness. In addition, when the State asked forensic interviewer McConnell if she had seen any signs B.O. had been coached or was trying to manipulate a family situation, McConnell testified she had seen no "red flags or anything like that." McConnell also explained that, in interviewing a child, she looked for, and found in this case, consistency throughout the interview, the use of sensory details, and an ability to describe things as they happened. Furthermore, appellant's statements during his interview corroborated aspects of B.O.'s testimony and her outcry statements to McConnell. Appellant admitted, for example, that he went into the girls' room almost every night to check on them and he "accidentally" touched the top part of B.O.'s "vagina area" approximately five times over several years. Appellant said he felt "really dirty" after touching B.O., and he indicated that he believed touching her was wrong, even if for only a second.

Appellant further argues that some of B.O.'s statements conflicted with the testimony of other witnesses. Appellant points out that B.O. said she slept in a bedroom alone, while her stepsister Rebeca testified they slept in the same room. But Rebeca testified that she typically fell asleep on the couch and would get up and go into the girls' room at around midnight, after they had gone to sleep, and that she slept on the top bunk bed. Rebeca acknowledged that appellant came into the room most nights and she had no idea what he did or did not do when he was there; she would just see him go in and put the covers on and leave the room. Moreover, Rebeca—who lived in the house for approximately eighteen months—agreed that there were opportunities for appellant to have committed the offenses when she was not present.

Appellant comments that B.O. thought her mother worked nights at the time of some of

the sexual abuse, but evidence showed she mostly worked during the day.  Asked about this apparent discrepancy, McConnell testified that one should not expect a child talking about sexual abuse that happened over a number of years to always recall exactly where her parents were at the time.  McConnell explained that "[w]hen things are occurring over and over again it's hard to separate things and be very precise about who was where and what, because it was something that was happening over and over again."

Appellant also comments that B.O. never told the forensic interviewer that appellant placed his mouth on her sexual organ, although the child testified that this occurred.  McConnell testified that this did not concern her, explaining that the "disclosure process" could trigger other memories after B.O. left the interview or as she grew more comfortable talking about what had happened.

Finally, appellant points out that while B.O. testified appellant's penis felt "[h]ard" when he placed her hand on it over appellant's clothes, she told McConnell she could not say what it felt like.  McConnell, however, testified that even if a child did not seem embarrassed—as B.O. did not appear to be—to discuss body parts in a situation like this, they would not always tell an interviewer everything about them or describe how they felt.

It was the responsibility of the factfinder to resolve the conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic to ultimate facts.  *See Jackson*, 443 U.S. at 319; *see also Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997).  We do not sit as the thirteenth juror and substitute our judgment for that of the factfinder by re-evaluating the weight and credibility of the evidence.  *Isassi*, 330 S.W.3d at 638.  Viewing the evidence under the appropriate standard, the trial court could have found beyond a reasonable doubt that appellant committed two or more acts of sexual abuse during a period of thirty or more days, as charged in the indictment.  Deferring to the factfinder's determination of the credibility of the

–19–

witnesses and the weight to be given to their testimony, based on the cumulative force of all the evidence when viewed in the light most favorable to the verdict, and considering the reasonable inferences to be drawn from that evidence, we therefore conclude a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. We overrule appellant's second issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. 47
160970F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

CLEOFAS ALEJANDRO RUIZ, Appellant

No. 05-16-00970-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District Court, Collin County, Texas
Trial Court Cause No. 296-80461-2016.
Opinion delivered by Justice Myers. Justices Lang and Stoddart participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 28th day of July, 2017.