

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE STATE TEXAS, | § | No. 08-24-00322-CR |
| Appellant, | § | Appeal from the |
| v. | § | 327th District Court |
| KEVIN ROBLES, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20230D00779) |

# **O P I N I O N**

Appellee Kevin Robles moved to suppress a custodial statement he made to police after his arrest for the murder of his grandfather, Juan Julian Macias Salas, on the following grounds: (1) that it was not made voluntarily, knowingly, and intelligently; and (2) that the police failed to scrupulously honor his right to remain silent after he invoked it at the start of the interview. In granting his motion on the first ground, the trial court found Robles suffered from a disability that affected his ability to understand his rights; he was visibly distraught during the interrogation; he twice asked to terminate the interview; and the police engaged in a coercive tactic, using language suggesting Robles was required to speak with them. Although we express no opinion as to whether Robles made a voluntary, knowing, or intelligent waiver of his rights, we conclude, as a matter of law, that the police failed to scrupulously honor his unambiguous request to terminate the

interview, as required by both *Miranda* and the Texas Code of Criminal Procedure. On that basis, we affirm, holding that the trial court did not abuse its discretion in suppressing Robles's statement.

## I. FACTUAL BACKGROUND

### A. The complaint affidavit

According to a complaint affidavit, the police responded to a 911 call on December 14, 2022, from Robles's father, Jaime Robles, reporting that the victim, Juan Julian Macias Salas, Robles's 81-year-old grandfather, had been stabbed in the home he shared with Robles and his parents. When the police and paramedics arrived at the house, Macias Salas showed no signs of life. He had "blood on his face and neck with a possible stab wound to the neck." The officers spoke with Robles's parents at the scene. Robles's father reported that Robles had called him from an unknown number asking for a ride home and informing him that he had attacked the victim with a knife and needed help. Until the phone call, the parents did not know Robles had left the house earlier that morning. After they picked Robles up and returned home, his father "observed the victim with blood on his face and neck and called 911."

Robles was arrested that same day pursuant to an arrest warrant charging him with Macias Salas's murder. He received magistrate warnings that evening. Almost four hours later, a handcuffed Robles was led to an interrogation room at an El Paso police station where a recorded interview took place with two detectives.

### B. The police interrogation

Robles was initially offered food and drinks, which he accepted, drinking a cup of coffee and eating alone in the interrogation room. Approximately ten minutes later, at 10:26 p.m., Detectives Jorge Carreon and Amy de la Rosa of the El Paso Police Department entered the room. De la Rosa asked Robles background questions primarily regarding his age, residence, level of

2

education, and work history. Robles said he did not graduate from high school. Somewhat confusingly, Robles told her he was not working but had a "cash-paying job" and had stopped working that day.

Next, de la Rosa told Robles he was under arrest and she would be reading him his rights. She read Robles his *Miranda* rights and his right under the Texas Code of Criminal Procedure "to terminate this interview at any time."[1] She then asked Robles if he was a United States citizen, and after he responded "yes," the following exchange occurred:

> de la Rosa:    Okay. Now this is most important, okay Kevin? You do understand your rights and you hereby knowingly, intelligently, and voluntarily waive these rights. So, what that means is that you are going to talk with us today, okay?
>
> Robles:        Yes.[2]

De la Rosa then proceeded to question him. She asked who lived in his house, to which Robles responded that had been living there with his parents and grandfather for approximately four-and-a-half years, along with a younger brother who was away at college. She asked Robles what he did the day before his arrest. Robles responded that he had gone to work and come back

---

[1] The Code provides:
   No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:
   (a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:
      (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
      (2) any statement he makes may be used as evidence against him in court;
      (3) he has the right to have a lawyer present to advise him prior to and during any questioning;
      (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
      (5) he has the right to terminate the interview at any time.

Tex. Code Crim. Proc. Ann. art. 38.22(a)(1–5).

[2] As Robles points out, the video does not depict Robles executing a written *Miranda* waiver, and the appellate record does not contain a written *Miranda* waiver.

and did "nothing" other than "surfing the web" on his phone in his bedroom. Robles then trailed off and the following colloquy took place:

| | |
|---|---|
| de la Rosa: | Mm-hmm. |
| Robles: | I got kind of agitated and went into crisis. |
| de la Rosa: | Okay. |
| Robles: | But uh—I think I'm done with this interview. |
| de la Rosa: | You—you're saying you're—you felt agitated and you went into crisis? |
| Robles: | Yes. |
| de la Rosa: | And you say you felt done with this interview? |
| Robles: | Yes. Um—[3] |
| de la Rosa: | How are you feeling? |
| Robles: | Uh. |
| de la Rosa: | Right now, anyway. I know you felt agitated last night. But how do you feel right now? |
| Robles: | Uh, I feel—can you repeat yourself? |
| de la Rosa: | Yes, sir. I'm trying to figure out how you feel right now. |
| Robles: | Um, well. I didn't sleep— |
| de la Rosa: | Okay. |
| Robles: | —through this whole process. |
| de la Rosa: | Uh-huh. |
| Robles: | So, I feel a little tired and low. |
| de la Rosa: | Yeah. |
| Robles: | I was trying to sleep over there. |
| de la Rosa: | Yeah. |
| Robles: | I felt a little hungry, but— |
| de la Rosa: | But you maybe feel better. |
| Robles: | Yes, I feel a little—healthy? You know? To have—a conversation? |
| de la Rosa: | Yes, sir. |
| Robles: | In the right way, you know? |

---

[3] De la Rosa interrupts Robles prior to his response as to whether he is done with the interview.

| | |
|---|---|
| de la Rosa: | Yes, sir. |
| Robles: | And not in a bad way. |
| de la Rosa: | Exactly. |
| Robles: | Other than that, um—What would you guys like to know? |
| de la Rosa: | What happened to your grandpa? |
| Robles: | Uh. I just went into crisis. And I just laid my hands on him. |
| de la Rosa: | Were you upset with your grandpa? |
| Robles: | Uh, no. |

Upon further questioning, Robles reported that he laid his hands on Macias Salas with a fork in Macias Salas's room, and his father later told him that Macias Salas had a wound, gesturing toward his cheek. When asked if he remembered what happened upon entering Macias Salas's room, Robles hesitated. De la Rosa assured him that it was okay to talk to them and that he did not have to be nervous. Robles responded that he "just blacked out a little bit" and did not "know what went through [his] mind." At one point, when de la Rosa asked Robles if he was mad at Macias Salas, he responded that he was not and that he "just went into crisis" and "couldn't help it."

Carreon then asked him for details about the fork, and Robles responded that he had taken it from the kitchen, "shaved it" with sandpaper, and made it "sharp." He informed the detectives that he did not want to make a "big wound." Upon further questioning, Robles explained that he sharpened the fork "yesterday" to "assault him." He recalled that Macias Salas was asleep when Robles entered his bedroom, but he "got up a little," then Robles "laid hands on him." When Robles hesitated after de la Rosa asked what he meant by laying hands on Macias Salas, Carreon asked Robles what he was "trying to do." Robles responded that he "really didn't know" and that he sometimes goes "into crisis" and "hears voices." Robles explained that the voices tell him he is "nobody," that he "should kill someone before they kill [him]," that he should "kill someone" or "kill [himself]," and that he is "not worth living."

According to Robles, after he laid hands on Macias Salas, he flushed the fork down the toilet in his bathroom. He then walked to a gas station to buy cigarettes, explaining that he was "stressed out" because he had "a life on [his] hands." Robles recalled calling his father for a ride home after that.

Rather abruptly, Robles then stated: "That's it. I'm done talking for now." De la Rosa responded, "okay, you're done talking for now." She then asked if he had any questions for them, and Robles responded in the negative. Next, Carreon told Robles that he would explain the process to him and that Robles would be taken to "county." Robles then asked, "no more charge?" Carreon responded that he was charged with murder.

Carreon proceeded to ask Robles for consent to obtain his DNA sample. Robles responded that he would "wait for a lawyer" before providing a sample, referencing the First Amendment. When Carreon asked Robles if he had any questions, Robles again responded that he did not, and the interview ended at 10:41:28.

## II. PROCEDURAL BACKGROUND

### A. The indictment

Robles was charged by indictment with one count of murder, alleging that on December 14, 2022, he "intentionally or knowingly cause[d] the death of . . . Julian Salas Macias by stabbing [him] about the body with a sharp object."[4]

### B. Robles's motion to suppress

On June 3, 2024, Robles filed a motion to suppress his statement, arguing it was illegally obtained in violation of the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution,

---

[4] Robles initially filed a notice of intent to raise an insanity defense but withdrew it after the trial court granted the motion to suppress his confession.

6

the Texas Constitution, and the Texas Code of Criminal Procedure. The State did not file a written response, but it opposed the motion at the August 1, 2024 suppression hearing.

### C. Schutte's testimony at the suppression hearing

At the suppression hearing, Robles called Dr. James Schutte, a licensed psychologist, to testify. Despite receiving permission in November 2023 to have its own mental health expert interview Robles, the State did not present an expert at the hearing.[5]

Schutte testified that he administered several standardized psychological tests to Robles, which revealed, among other things, that his IQ was within "the extremely low range," he had a low reading level, and his ability to concentrate "scored in the mildly to severely impaired range indicating he has trouble with both attention and concentration." Schutte also administered tests to determine Robles's ability to understand his *Miranda* rights. When describing the *Miranda* warnings in his own words, Robles "scored in the sixth percentile, which meant that he has less *Miranda* knowledge than 94 percent of pretrial defendants." Schutte testified that he had only seen such a low score in "very unusual cases" in which the person had "a severe mental illness or an intellectual disability." And Robles's responses to the *Miranda* Acquiescence Questionnaire indicated that he was "more likely than 99 percent of criminal defendants to go along with authority."

Schutte also reviewed Robles's medical records, which indicated that Robles had been diagnosed with "severe mental illnesses," including "unspecified mood disorder, major depressive

---

[5] In August 2023, the State filed a motion to allow its expert to examine Robles, which the court granted in November 2023. In March 2024, the State designated a potential expert witness to testify at trial, but it is unclear whether the expert had interviewed Robles. However, at the conclusion of the suppression hearing, the State's attorney argued that he was not aware Robles would be presenting an expert witness at the hearing and that he felt "sandbagged" by not having "a chance" to have the State's expert available at the hearing "to contradict things [Schutte] said." The court stated that it had already "allow[ed] [Schutte] to testify," effectively overruling any objection the State may have had to Schutte's testimony. The State does not complain on appeal about the lack of opportunity to present an expert at the hearing.

disorder with psychosis, schizophrenia and paranoid schizophrenia." Though he did not give diagnoses dates, Schutte noted that at least one "examining psychiatrist" diagnosed Robles with paranoid schizophrenia in 2021.[6]

Schutte stated that Robles's test scores revealed that he was "functioning at a very low level as far as his reasoning abilities." He further opined that Robles's intellectual capacity was lower than 99 percent of the population due to his mental illness, and he was "functioning within the range of someone with an intellectual disability."

### (1) Schutte's review of the recorded interview

Schutte also testified that he reviewed the video recording of the interview, which was introduced in evidence at the hearing. Schutte observed Robles's odd and eccentric responses to some of the detectives' questions, such as stating that he could talk in the "right way," which Schutte believed was "indicative of [a] mental health issue."

Schutte also noted that Robles often asked the detectives to repeat their questions, appeared confused at times, and expressed that he was tired and had not slept since the day before, all of which generally reflected difficulty in concentrating. Not sleeping, Schutte explained, could affect a person's "cognitive functions" and impair their ability to concentrate as well as their judgment. He testified that Robles's eccentric speech, concentration difficulties, and shaking legs throughout the interview were all "signs of psychosis." He opined that "psychosis and other mental conditions [could] affect [an individual's] ability to understand his *Miranda* rights."

Schutte also found it significant that, after de la Rosa read Robles his rights, rather than asking him if he understood his rights, she made a declarative statement: "[y]ou do understand your rights and hereby waive them." In other words, Schutte believed de la Rosa "told [Robles]

---

[6] It does not appear that Schutte independently diagnosed Robles when he met with him prior to the hearing.

that he understood his rights." And rather than asking Robles if he wished to speak to them, Schutte pointed out, de la Rosa told Robles, "what that means is that you are going to talk with us today, okay?" Schutte expressed concern that—particularly given Robles's mental health history and test results—Robles simply "acquiesce[d] to what [was] essentially a command rather than a question."

Schutte testified that Robles tried to stop the interview three times despite his limited intellectual capacity and mental health issues. Schutte opined that it was coercive for de la Rosa to continue asking Robles questions until he agreed to continue speaking with her. Schutte explained the "acquiescent style," i.e., where a person tries to exert himself, but after being "rejected," acquiesces to the other person's will.

Throughout his testimony, Schutte opined that based on his review of the video, Robles's low IQ, and his mental health issues, Robles was not capable of understanding his *Miranda* rights at that time or of intelligently waiving them.

### D. The attorneys' arguments

At the close of evidence, Robles's attorney urged two grounds for suppressing the statement he gave to police. First, he maintained the State did not prove that Robles intentionally or knowingly waived his *Miranda* rights, based on the totality of the circumstances, including Robles's age, experience, limited education, low IQ, and mental health issues, as well as his lack of sleep, confusion, and psychological stress. Second, he argued Robles tried to stop the interview three times, but the detectives did not respect his right to remain silent.

The State countered that Robles's arguments were contradictory: on the one hand, Robles was asserting that he did not understand his rights, while on the other hand, he was maintaining that he attempted to terminate the interview, which indicated Robles did understand his rights. The State also contended that Robles's attempts to terminate the interview were ambiguous and

therefore insufficient to invoke the right to counsel such that the detectives were not required to stop the interview or ask clarifying questions.

The State further posited that Robles understood his rights as evidenced by his invocation of the right to counsel after being asked to give a DNA sample. In conclusion, the State argued there was nothing coercive about the detectives' actions, and despite Robles's mental health issues, he was able to understand his rights.

### E. The trial court's findings of fact and conclusions of law

In its order granting Robles's motion to suppress, the trial court concluded that his statement was not made voluntarily, knowingly, and intelligently, making several fact findings in support of its decision. The court's findings included: (1) Robles suffered from "severe psychological impairments that affect[ed] his cognitive functioning and decision-making abilities"; (2) Robles's intellectual functioning was "extremely low to borderline range," which "severely limit[ed] his understanding of legal concepts and his ability to make informed decisions"; (3) during the interview, Robles "exhibited signs of distress and confusion," suggesting "he was not in a mental state capable of understanding or waiving his *Miranda* rights voluntarily and knowingly"; (4) Robles attempted to stop the interrogation three times, but his requests were not honored, "indicating that he did not feel free to exercise his right to remain silent"; and (5) the detectives used coercive interrogation methods by telling Robles he was waiving his rights rather than asking him if he understood them, thereby "exploit[ing] his high level of acquiescence," as reflected in Schutte's assessment.

The trial court also drew extensive conclusions of law, determining that under a totality-of-the-circumstances test, considering Robles's "mental health issues, low intellectual functioning, repeated attempts to stop the interrogation, and the coercive nature of the interrogation," his waiver

10

was not voluntary, knowing, or intelligent. The court concluded, based on this "confluence of factors," that Robles's confession was "not obtained in compliance with constitutional standards for a voluntary and knowing waiver of rights" and was therefore inadmissible in court. The State appealed.

## III. ISSUES ON APPEAL

On appeal, the State contends the trial court erred in granting Robles's motion, maintaining (1) it met its burden of establishing that the statement was made voluntarily, knowingly, and intelligently; and (2) Robles did not make an unambiguous request to terminate the interview that required the detectives to cease questioning him. Because we conclude that the record supports a finding that Robles made an unambiguous request to terminate the interview, which the police did not scrupulously honor, we affirm the trial court's order suppressing Robles's statement on that basis without addressing whether Robles voluntarily, knowingly and intelligently waived his rights.[7]

## IV. WAS ROBLES'S STATEMENT PROPERLY SUPPRESSED BASED ON THE STATE'S FAILURE TO TERMINATE THE INTERVIEW?

### A. Standard of review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *See Alford v. State*, 358 S.W.3d 647, 652 (Tex. Crim. App. 2012). We afford "almost total deference to the trial judge's rulings on questions of historical fact and on application of law to fact questions that turn upon credibility and demeanor." *Id.* "That same deferential standard of

---

[7] Although the trial court did not base its decision to suppress Robles's statement on the ground we find dispositive of the appeal, the State acknowledges that this issue was properly raised in the trial court. As Robles points out, any "theory of law" that was properly presented in the trial court to support the trial court's decision may serve as a basis for an appellate court to uphold the decision on appeal. *See State v. Copeland*, 501 S.W.3d 610, 613 (Tex. Crim. App. 2016).

review 'applies to a trial court's determination of historical facts [even] when that determination is based on a videotape recording admitted into evidence at a suppression hearing.'" *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013) (quoting *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006)). We review "*de novo* the trial court's rulings on application of law to fact questions that do not turn upon credibility and demeanor." *Alford*, 358 S.W.3d at 652. We also conduct a de novo review of pure questions of law. *See State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011).

A trial court's ruling on a motion to suppress "will be sustained if it is correct on any applicable theory of law and the record reasonably supports it." *State v. Arellano*, 600 S.W.3d 53, 57–58 (Tex. Crim. App. 2020) (citing *State v. Ruiz*, 581 S.W.3d 782, 785 (Tex. Crim. App. 2019)).

### B. Applicable law

To be admissible in evidence, a confession must be taken in compliance with the U.S. Supreme Court's holding in *Miranda* and Article 38.22 of the Code of Criminal Procedure. *See Oursbourn v. State*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008) (recognizing that a defendant may claim that a confession should be suppressed under several different theories including that it was taken in violation of *Miranda* and Article 38.22 of the Code). Both *Miranda* and Article 38.22 require virtually identical warnings prior to custodial interrogation, including a warning that the accused has the right to remain silent, that any statement may be used against the accused in a court of law, that the accused is entitled to an attorney, and that if he is unable to afford an attorney he has the right to an appointed attorney to advise him; however, Article 38.22 adds that an accused must be warned of his right to terminate the interview at any time. *See Herrera v. State*, 241 S.W.3d 520, 526 (Tex. Crim. App. 2007) (citing Tex. Code Crim. Proc. Ann. art. 38.22 § 2(a)(5)).

12

Under *Miranda*, if a suspect makes an unambiguous request to terminate an interview or otherwise cease police questioning, thereby invoking his right to remain silent, his request must be "scrupulously honored" and all questioning must cease.[8] *Sandoval v. State*, 665 S.W.3d 496, 520 (Tex. Crim. App. 2022) (quoting *Michigan v. Mosley*, 423 U.S. 96, 103–04 (1975)). "If a statement is governed by *Miranda* (i.e., the suspect is in custody), then a failure to cut off questioning after a suspect invokes his right to remain silent violates his rights and renders any subsequently obtained statements inadmissible." *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996) (citing *Mosley*, 423 U.S. 96). However, if a suspect's invocation of this right is not unambiguous, a law enforcement officer is not required to cease questioning or to clarify an ambiguous remark, although the latter is good practice. *See Sandoval*, 665 S.W.3d at 520 (recognizing that "a suspect's invocation of this right must be unambiguous, and there is no requirement that law enforcement clarify ambiguous remarks"); *see also Davis v. United States*, 512 U.S. 452, 461 (1994) (recognizing that although not required, "it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney" "when a suspect makes an ambiguous or equivocal statement").

Courts have grappled with the question of what constitutes an unambiguous invocation of the right to remain silent. In *Ramos*, the Court of Criminal Appeals held that a "suspect need not use any particular phraseology to invoke the right to remain silent." *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). It further held that "[i]f the individual [in custody] indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the

---

[8] In *Sandoval*, the Court of Criminal Appeals relied solely on *Miranda* in concluding that a suspect's assertion of his right to terminate an interview must be "scrupulously honored," noting that it "need not and do not address whether Article 38.22 even has an equivalent to the *Miranda* 'scrupulously honored' requirement." *Sandoval v. State*, 665 S.W.3d 496, 520, n.77 (Tex. Crim. App. 2022).

interrogation must cease." *Id.* (citing *Miranda*, 384 U.S. at 473–474). The court went on to recognize that "any declaration of a desire to terminate the contact or inquiry . . . should suffice. The same is true of silence in the face of repeated questioning, or an effort to end the contact with the interrogator." *Id.* (citing W. LAFAVE, ET AL., CRIMINAL PROCEDURE § 6.9(f) at 853 (3d ed. 2007) (footnotes omitted)); *see also Watson v. State*, 762 S.W.2d 591, 597 (Tex. Crim. App. 1988) (en banc) (recognizing that "[t]here is no talismanic word or phrase with which to invoke the right to remain silent"). Ultimately, whether a suspect unambiguously invoked the right to remain silent must "be decided on the totality of the circumstances in that particular case." *Watson*, 762 S.W.2d at 597; *see also Day v. State*, 696 S.W.3d 720, 730 (Tex. App.—San Antonio 2024, pet. ref'd) ("In determining whether the right to remain silent was unambiguously invoked, courts look at the totality of the circumstances.").

### C. Analysis

We first consider whether Robles's initial statement, "I think I'm done with this interview," constitutes an unambiguous invocation of the right to remain silent. The State maintains the statement was ambiguous because Robles prefaced it with, "I think," and the detectives were therefore permitted to continue the interview or to ask him clarifying questions. Citing various dictionary definitions, the State argues "I think" connotes that the declarant is "saying that [he] believe[s] something is true, although [he] is not sure." *See I think*, LONGMAN DICTIONARY, https://www.ldoceonline.com/dictionary/i-think (last visited May 13, 2025); *Think*, WEBSTER'S II NEW COLLEGE DICTIONARY (1999) (defining "think" as to "weigh or consider [an] idea"). The State also cites our holding in *Vieira* where we concluded a suspect's statement that "I am thinking it's time to talk to a lawyer, I guess" was not an unambiguous invocation of the right to counsel. *See Vieira v. State*, No. 08-16-00100-CR, 2018 WL 3084155, at *4 (Tex. App.—El Paso June 22,

14

2018, no pet.) (not designated for publication). In that case, however, we recognized that in at least one case, the Court of Criminal Appeals held that "I think I want a lawyer" was a clear and unequivocal assertion of the right to consult with counsel. *Id.* (citing *Jones v. State*, 742 S.W.2d 398, 405–06 (Tex. Crim. App. 1987) (holding that defendant's statement to police, "I think I want a lawyer," was a clear and unequivocal assertion of the right to consult with counsel prior to any questioning)). However, we found it significant that the defendant in *Vieira* used the conditional words "I guess" at the end of his statement, thereby rendering his request ambiguous. *Id.* at *4–5. Here, Robles made no qualifying phrase following "I think I'm done with this interview." We construe this similarly to Vieira's statement "I am thinking it's time to talk to a lawyer" before the qualifier, and Jones's statement "I think I want a lawyer."[9]  *Id.*; *Jones*, 742 S.W.2d at 405–06.

The State also relies on a line of cases in which the suspects qualified their purported attempts to stop an interview by expressing fatigue, thereby indicating a physical inability to continue their interviews rather than invoking their right to remain silent. *See, e.g.*, *Franks v. State*, 90 S.W.3d 771, 787 (Tex. App.—Fort Worth 2002, no pet.) (holding that the defendant's statement that he "did not want to talk anymore" and "was tired" was an ambiguous and ineffective invocation of his right to remain silent) (citing *Dowthitt*, 931 S.W.2d at 257 (suspect's statement "I can't say more than that. I need to rest." was not an unambiguous invocation of the right to remain silent but "merely indicate[d] that he believed he was physically unable to continue—not that he desired to quit")). Here, while Robles later expressed his fatigue due to not having slept

---

[9] The State also relies on our sister court's holding in *Pratt v. State*, in which the court held that the suspect's statement that "I think I need a lawyer, bro" was a "verbal contemplation" not an unambiguous statement requesting a lawyer. *Pratt v. State*, No. 11-14-00329-CR, 2016 WL 2976111, at *2 (Tex. App.—Eastland May 19, 2016, no pet.) (mem. op., not designated for publication). To the extent the Eastland court's opinion conflicts with the holding in *Jones*, it can be distinguished because in *Pratt,* the suspect did not stop with that statement; instead, he continued to speak with the officers thereafter incriminating himself. *Id.* at *2.

since the day before, he did not qualify his initial statement that he thought he was done with the interview for that reason. We therefore find this line of cases inapposite.

The State also contends that after Robles made his statement that he thought he was done with the interview, Robles "immediately reversed course and decided to continue with the interview," thereby rendering his statement equivocal. The State correctly points out that if a suspect immediately changes his mind after invoking his right to remain silent and voluntarily decides to speak with the officers interrogating him, the officers may continue with the interview. *See, e.g.*, *Griffith v. State*, No. 09-13-00383-CR, 2015 WL 5093355, at *7 (Tex. App.—Beaumont Aug. 31, 2015, pet. ref'd) (mem. op., not designated for publication) (finding no *Miranda* violation, when, "[a]lmost immediately after [the suspect] purportedly invoked his right to terminate the interrogation, he reinitiated the interrogation with his inquiry into what the officers wanted to ask him and why they were at his residence, and his denial of any wrongdoing").[10] Here, however, Robles did not "immediately" reverse course after making his initial statement that he thought he was "done" with the interview. To the contrary, he only did so over a minute and a half later, after de la Rosa continued questioning him. The State has not cited any other authority to support a finding that Robles's statement was not an unambiguous invocation of his right to remain silent.

But even if we were to construe Robles's statement as ambiguous, his response to de la Rosa's continued questioning was not. As set forth above, if a suspect makes an ambiguous statement, an officer is permitted to ask clarifying questions to determine if in fact the suspect

---

[10] The court in *Griffith* collected numerous cases in which courts have held that a suspect did not unambiguously invoke his right to terminate an interrogation if he almost immediately thereafter expressed an intent to speak with the interrogating officers. *See Griffith v. State*, No. 09-13-00383-CR, 2015 WL 5093355, at *7 (Tex. App.—Beaumont Aug. 31, 2015, pet. ref'd) (mem. op., not designated for publication).

16

wishes to invoke his right to remain silent. *See Chavez v. State*, No. 08-16-00084-CR, 2018 WL 2715219, at \*5 (Tex. App.—El Paso June 6, 2018, pet. ref'd) (not designated for publication) (recognizing that "[a]n officer does not violate a suspect's right to remain silent when he attempts to clarify whether the suspect wishes to remain silent"). Here, after Robles initially said he thought he was done with the interview, de la Rosa did ask Robles a clarifying question: "And you say you felt done with this interview?" Robles responded, "yes."

The State contends that Robles's response to the clarifying question was itself ambiguous because de la Rosa used the equivocal word "felt" in her question. The only case the State cites in support of this argument is our sister court's opinion in which it held that a suspect's statement "I feel like I need a lawyer" was not an ambiguous invocation of the right to counsel, due to the equivocal nature of the term "feel." *See Hogue v. State*, No. 11-11-00143-CR, 2013 WL 1748836, at \*3 (Tex. App.—Eastland Apr. 18, 2013, no pet.) (mem. op., not designated for publication). But the State has not cited any cases for the proposition that asking a suspect if he "felt" he was done with an interview would be considered an ambiguous question or that an affirmative response to such a follow-up question could be considered ambiguous. As the State seems to acknowledge, de la Rosa's question was for the purpose of clarifying whether Robles wished to terminate the interview. We believe a reasonable suspect would have interpreted the question as such.

We therefore conclude that after Robles responded in the affirmative to de la Rosa's clarifying question, she was required to cease all questioning and was not permitted to attempt to persuade Robles to waive his already asserted right to remain silent. *See Dowthitt*, 931 S.W.2d at 257 (recognizing that after a suspect makes an unambiguous invocation of his right to remain silent, "law enforcement officer may not continue to question [him] until the officer succeeds in persuading the suspect to change his mind and talk"); *see also Granberry v. State*, 745 S.W.2d 34,

17

37 (Tex. App.—Houston [14th Dist.] 1987, pet. ref'd) (recognizing that if the defendant had responded "no" when asked if he would waive his right to terminate the interview, the defendant's rights would have been violated if custodial interrogation had continued).

Rather than honoring Robles's request to terminate the interview, de la Rosa engaged in what appears to have been a calculated attempt to persuade Robles to waive his right to terminate the interview and waive his right to remain silent. Specifically, after Robles replied, "Yes. Um" to de la Rosa's question regarding whether he "felt done with this interview," de la Rosa interrupted him and repeatedly asked him how he was currently feeling. And despite Robles telling her he was tired and had not slept, de la Rosa stated in a declarative manner: "But you maybe feel better." After Robles ultimately agreed that he was feeling better and was in the "right way" to have a conversation, de la Rosa continued her custodial interrogation, asking Robles what happened to his grandfather. Only at this point did Robles confess.

Given the totality of the circumstances, we conclude that Robles's right to remain silent was violated and that Robles's confession was properly suppressed on that basis.

The State's second issue is overruled.[11]

## V. CONCLUSION

As the trial court did not abuse its discretion in granting Robles's motion to suppress, we affirm.

LISA J. SOTO, Justice

---

[11] Because we conclude that the trial court properly suppressed Robles's statement on this basis, we need not consider whether the trial court correctly concluded that the statement was subject to suppression based on Robles's argument that he did not voluntarily, knowingly, and intelligently waive his Miranda rights. *See* Tex. R. App. P. 47.1 ("The court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal.").

18

July 31, 2025

Before Salas Mendoza, C.J., Palafox and Soto, JJ.

(Publish)